Eby Estate

*Barley, Snyder, Cooper & Barber,* for accountant.

*Geisenberger, Zimmerman, Pfannebecker & Gibbel,* for Farmers First Bank.

*Wenger & Byler,* for Richard R. Eby, residuary beneficiary.

*Glazier, Minney, Mecum & Kohr,* for Estate of Ivan L. Eby, a legatee.

APPEL, *J.,* February 3, 1977—The interrelationship between two unmarried sisters, Gertrude S. Eby and Britannia Eby, has produced four varied issues for disposition by the court. Following the framing of the issues, there have resulted two days of testimony productive of 473 pages of record with 14 witnesses and 21 exhibits. Briefs by opposing counsel extending through 33 and 20 pages have

been filed. Having exhaustively pursued the various materials which we are required to consider, we undertake to explain the conclusions we have reached.

Two of the issues involve the administration of a trust in Gertrude's estate. The other two issues pertain to the conduct of Britannia's affairs during her lifetime and could consequently affect her estate. One institution, Farmers First Bank, formerly The Farmers National Bank of Lititz, performed in three fiduciary capacities. It was trustee under the will of Gertrude, attorney-in-fact for Britannia, and executor of Britannia's will. Because one institution is involved, albeit in three capacities, and because the issues are interrelated, we deem it appropriate that one opinion dispose of the matters which have been raised, even though they pertain to separate estates.

The sisters had resided together for some time at 647 State Street, Lancaster, Pa., which was owned by Britannia. Gertrude, the elder of the two, died on January 31, 1965, in her ninetieth year. Britannia was then 80 years of age. She continued to live in the residence until the summer of 1969, when she entered a hospital. On August 8, 1969, she was transferred to a nursing home. She remained in the nursing home until her death on February 9, 1975, in her ninety-first year.

Gertrude's will, executed on September 5, 1961, gave the residue, after payment of debts and funeral expenses, to the bank in trust for the lifetime of Britannia. The provision applicable thereto is the following:

"2.  All of the rest, residue and remainder of my estate, real and personal, I give, devise and bequeath unto THE FARMERS NATIONAL BANK

OF LITITZ, as Trustee, in trust, to invest and reinvest the same for the lifetime of my sister, BRITANNIA EBY. In the event that my sister, BRITANNIA EBY, shall be in need of the income or principal or both of said trust for her comfort, maintenance and support, I direct that such sum or sums shall be paid to her or for her benefit, which my corporate trustee, in its sole discretion, shall deem necessary, using such amount as is not available for these purposes from my sister's own resources."

Upon Britannia's death the "then remaining principal together with any accumulated income accrued and unpaid to the date of her death," after the payment of cash legacies totaling $4,500, is distributable in eight shares, subsequently increased by codicil to nine shares.

The will contains the following investment clause:

"5. I authorize my Executor and Trustee to invest and reinvest, alter, vary and change investments, not being confined to what are technically known as legal investments; and to sell at public or private sale any real estate or interest in real estate which I own, as the Executor or Trustee shall deem advisable."

The first issue set forth in the stipulation arises from the administration of the trust established under Gertrude's will. It pertains to investments made in June 1971. At its May 4, 1971, meeting the trust committee considered the impending maturity of government obligations then owned by the trust. It adopted a resolution that the proceeds be invested "in bonds, seven per cent or better with a five to eight year maturity." The obligations which

were thereafter acquired were then retained by the trustee and were sold at losses almost immediately following Britannia's death.

The objectant and the trustee have stipulated that the issue is:

"Whether or not the acquisition and/or retention of the following securities and their subsequent sale at a loss constituted a failure on the part of the trustee to exercise due care in the performance of its duties:

"1. Chase Manhattan Mortgage & Realty Trust
Notes, 7-7/8%, due 5/1/78:
Purchased 6/1/71 at      $20,000.00
Sold 2/26/75 at      14,474.70
Loss      $5,525.30
"2. First Empire State Corporation
Notes, 7.90%, due 5/1/79:
Purchased 6/14/71 at      $10,000.00
Sold 2/24/75 at      8,800.00
Loss      1,200.00
"3. United Jersey Banks, 7.95%
Notes, due 6/15/79:
Purchased 6/21/71 at      $15,000.00
Sold 2/24/75 at      13,612.50
Loss      1,387.50
Total losses on conversion
of above investments—      $8,112.80"

The next issue pertaining to the trust involves income payments. In June 1965, the Farmers First Bank received a letter from Britannia requesting that the income from the trust be paid to her. Subsequently the trustee distributed all of the income to her periodically or used it for her benefit, relying on the power of attorney as its authority therefor.

The making of these payments has been objected to by one of the remaindermen. The objectant and the trustee have stipulated that the issue before the court is the following:

"Whether the payment by the Farmers First Bank, as Trustee for the Estate of Gertrude Eby, of the entire annual income of the trust to the life beneficiary, Britannia Eby, was a violation of the Trustee's duty to the residuary beneficiaries of Gertrude Eby's Estate in view of Britannia Eby's own assets and income. In connection therewith the following facts can be entered as a matter of record.

"1. The inventory and accounting filed by the Executor of Britannia Eby's Estate accurately reflect her financial worth at the time of her death.

"2. The accounting filed by the Farmers First Bank as attorney-in-fact for Britannia Eby accurately lists the total income received by and disbursements made on behalf of Britannia Eby from July 15, 1969, to February 24, 1975.

"3. Prior to July 15, 1969, Britannia Eby's taxable income is as shown on her income tax returns Form 1041, for the years 1966, 1967, 1968 and 1969 attached hereto. In addition she received nontaxable Social Security Retirement Benefits."

The income tax returns which have been mentioned disclose that Britannia had total income for the years stated as follows: 1966—$11,467; 1967—12,227; 1968—12,587; 1969—14,509.

On July 11, 1969, Britannia executed a letter of attorney appointing the bank as attorney-in-fact. The bank exercised the powers therein conferred on it from then until the death of Britannia. The objectant has raised two issues in Britannia's estate

which stem from the bank's conduct as attorney-in-fact. It is our opinion that these issues are properly before the court on the basis of objections filed. Their thrust is that the bank as executor did not receive from the bank as attorney-in-fact all that it should have received.

The third issue is that the bank was not entitled to commissions as attorney-in-fact, because, it is alleged, Britannia was not competent during that period. It is argued that the bank was an interloper and not entitled to compensation.

The fourth and last issue is whether the bank should be surcharged as attorney-in-fact because of its retention, maintenance and subsequent disposititon of Britannia's residence and automobile.

## ISSUE I—SURCHARGE OF TRUSTEE REINVESTMENTS

In June, 1971, the trustee invested $45,000. It placed $20,000 in Chase Manhattan Mortgage & Realty Trust Notes, a type of investment which is now well known as REITS. The remaining $25,000 was placed in the notes of two bank holding companies, one of which was located in western New York and the other in northern New Jersey. The loss which was sustained upon the sale of the securities in 1975 was $8,112.80, or approximately 18 percent. The loss on Chase notes was $5,525.30, or 27.6265 percent. On First Empire notes the loss was $1,200 or 12 percent, and on United Jersey the loss was $1,387.50, or 9.25 percent. Objections were filed as to each of the investments; however, all of the objectant's testimony and the thrust of his brief pertain to and are directed at the purchase and retention of the Chase notes. It may be that he has

thereby indicated an intention to abandon the objections about the bank holding company notes; however, we believe that our disposition of the objections about Chase and the reasoning on which it is based are applicable to First Empire and United Jersey. Therefore, we will make no further inquiry about abandonment.

Counsel for the objectant initially directs our attention to the prudent man rule stated in section 7302(b) the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, 20 Pa.C.S.A. § 7302, as follows:

"Any investment shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital. The authorization to make and retain investments pursuant to this subsection shall be in addition to, and independent of, authorizations to make investments pursuant to other provisions of this chapter and requirements applicable under other provisions of this chapter shall not affect investments also authorized by this subsection."

Although the will contains an investment clause, we deem that it, in effect, requires an application of the provisions above stated. The objectant has argued that there is a higher standard of care for judging the propriety of the bank's stewardship of the trust. Killey Trust, 457 Pa. 474, 326 A. 2d 372 (1974), is cited for the proposition that one who has

greater skill than a man of ordinary prudence or who procures his appointment by representing that he has greater skill will be held to the standard of skill which he has or which he represents himself to have.

Although the objectant has correctly stated the present law in Pennsylvania, we note that no evidence has been offered, in the case before us, either that the bank has a higher standard of skill or that it has represented itself that to have a higher standard of skill. We are of the opinion, nevertheless, that the mere being in the business of fiduciary relationships and holding oneself out to perform such duties are representations of a higher standard of skill than that possessed by the man of ordinary prudence and, therefore, impose that standard to the bank in this matter. A footnote in the majority opinion of Mr. Chief Justice Jones in Killey indicates that this thought has existed for some years. At page 478 the following footnote appears:

"As early as 1917 the Orphans' Court of Lancaster County recognized that '[m]ore today is required of trust companies than the one-time ordinary care, diligence and good faith. Extraordinary care is now expected of them. . . . ' Rudy Estate, 35 Lanc. L. Rev. 1 (Pa. O.C. 1917). In a similar vein, this Court in Lohm Estate, 440 Pa. 268, 269 A. 2d 451 (1970), found it reasonable to require an attorney to comply with a greater standard of care than a layman, but a lesser standard of care than an attorney experienced in estate tax matters."

Although we have concluded that the trustee is to be held to a higher standard of skill, it is, nevertheless, requisite that the standard be applied against

the backdrop structured by the caveat stated by Mr. Justice Roberts in his concurring opinion in Killey. In joining in the order, he states:

"However, I wish to emphasize that although a trustee is charged with the duties of preserving the corpus and making it productive, the court on remand must recognize that even the most skillful trustee may not at all times be able fully to preserve principal or to produce maximum income. A trustee is not a guarantor or insurer of the trust's success. But if the court finds that in the exercise of its duties the corporate fiduciary failed to use the care and skill it represented it possessed, it may impose a surcharge for any depreciation in the value of the principal or loss of income."

The position of the objectant is twofold. It is argued that the acquisition of the notes was without authority and that the retention thereof was a breach of a duty owed to the beneficiaries.

The discussion by Judge Taxis of the Court of Common Pleas of Montgomery County in Fisher Trust, 26 Fiduc. Rep. 276, 1 D. & C. 3d 205 (1976), is illuminating and pertinent both as to acquisition and retention. In Fisher, a corporate trustee purchased 445 shares of Fidelity Mortgage Investors (FMI), popularly called REIT securities, for $15,969.14. The purchase was approved by the trust investment committee on February 14, 1973, and apparently was consummated shortly thereafter. The account, which was filed after the death of the life tenant on December 25, 1974, stated no market value for the stock.

The steps preceding the acquisition of FMI in Fisher have been described in detail by Judge Taxis and are much more sophisticated and elaborate

than those which occurred prior to the acquisition of Chase in Eby.

In Fisher, the trust investment committee discussed FMI twice before it was purchased. Prior to the discussions, FMI was studied by members of the trust department. The primary researcher of the trust department was a member of the trust investment committee. Investment services were surveyed and studied in the formation of the recommendations to be made to the trust investment committee. It is significant that an important part of the recommendation was based on the January 8, 1973, issue of Standard and Poor's Investment Advisory Survey. It "reported, in part, as follows: 'We currently favor the three REITs discussed below, each of which is expected to maintain favorable earnings and asset growth . . . ' "

In Eby, the trust investment committee directed that certain proceeds to be received be invested in bonds, seven percent interest or better, with a five to eight year maturity. The head of the trust department having investment responsibility, Clyde Zink, then communicated with a representative of the brokerage house which had been servicing the bank for a period which exceeded ten years. Thereafter, the representative sent Mr. Zink prospectuses of forthcoming issues which came within the guidelines which had been established by the committee. The determination to acquire the particular investment was made by Mr. Zink, who testified with respect thereto, as follows:

"A. I would rely, partly on the recommendation of the broker because of our relationship and knowing the quality bonds that we would look at and on

occasions, buy, in addition to the prospectus which we received for each one of them in order to analyze ourselves before making the purchase and generally in the environment that existed at that time so far as interest rates, the economy, etc.

"Q. How about the ratings?

"A. The ratings were well within our limits, all three of them were rated double A by Fitch at the time I bought them and retained the double A rating until such time as we had to dispose of them."

It may readily be observed that the procedures which were followed by the bank in Fisher and by the present accountant are in marked contrast as to committee consideration and action, as to survey and recommendation, and as to final determination of the asset to be acquired. Although contrasts be noted, there also exist many comparisons. In each instance consideration was given to appropriate sources of information pertaining to the investment, the probable income to be derived therefrom, and the probable safety of the capital. In each instance consideration was given to general economic conditions. We submit that the main distinction to be drawn is that because of size the one fiduciary performed functions within the institution, the results of which were obtained by the other fiduciary from outside sources. In each instance a final determination had to be made. In Fisher, an important part of the recommendation was based on Standard and Poor's, an advisory service, whose publications were considered by Mr. Zink in the performance of his responsibilities.

Subsequent events have established that in neither instance did the contemplations which engendered the acquisition attain reality. In each instance the asset decreased in value. We are required, however, to apply the standard of performance in acquisition as of the time of performance and not subsequent thereto. It must be recognized as stated in Mereto Estate, 373 Pa. 466, at page 469, 96 A. 2d 115 (1953), that: "Trustees are not liable for failure to possess 'omni-present vision and prophetic foresight': Dickinson's Estate, 318 Pa., supra. 'There is no rule of law which requires that an executor's foresight must measure up to the standard of a legatee's hindsight': Shipley's Estate (No. 1), 337 Pa. 571. . . . "

The most troublesome aspect to us has been what we had conceived to have been the "newness" of the company and of the type of investments. In this connection the testimony of Kenneth Campbell, a witness for the trustee, is important. Because his testimony pertaining to retention is vitally significant, we deem it appropriate to state his qualifications at this point. Since he had been a witness in Fisher, we may accomplish this most readily by quoting Judge Taxis at page 213:

"Kenneth D. Campbell, an expert analyst in real estate investment trusts (including FMI), testified on trustee's behalf. This expert witness is the principal founder and principal shareholder of an independent advisory company registered with the Securities and Exchange Commission. His company has an advisory service, published monthly since March 1970, on the securities of real estate investment trusts."

The following testimony of Mr. Campbell explains the origin and growth of REITs.

"BY MR. BYLER:

"Q. Mr. Campbell, do I understand basically, what you are saying is if you are going to invest in REITs, that Chase Manhattan, that these notes were good ones to invest in?

"A. Because they're senior debt, that's true.

"Q. And because Chase Manhattan was the first big bank to get involved?

"A. That's a factor, it's not a significant, it's not the major factor. The major factor is that you're secured by first mortgage, that the portfolio is largely first mortgage debt which has a higher status than the debt that you are lending.

"Q. At that time if you were going to invest, your only choice would have been in Chase Manhattan, other than these smaller real estate groups or small banking institutions' investments, is that right?

"A. You could, there were probably a bank sponsored REIT or two around at the time, and at that particular time, as I remember Wells Fargo and Bank of America had offerings that were in the mill so that's only initial offering in June of 1970. In May of '71', this certainly was the only senior note that was being offered.

"Q. This was a new industry, wasn't it, the REIT, a kind of virgin in investment in securities?

"A. I think Wall Street tended to regard it as a new industry, it wasn't really a very new kind of an industry. It had been started in 1960, a number of trusts had been formed in the year, '61' through '62', and two mortgage trusts in particular, Continental Mortgage Investors and First Mortgage Investors had established some quite exceptional records through the 1966 credit crunch which was

particularly severe, so that what Wall Street was saying, if two can do successfully through the real estate cycle, then obviously others can do it through the real estate cycle.

"Q. So from that beginning in the 1960s of the few you mentioned, in 1970 and 1971, how many REITs first came on the market?

"A. Well, there were

"Q. Hundreds?

"A. No, in the four years just approximately one-hundred.

"Q. Arising from a base of a half a dozen.

"A. Well actually, that's not quite true. There were approximately thirty in operation, if you wanted to take a date as of January 1st, 1969, there were approximately thirty real estate trusts of significant size. I'm not terribly interested in the small ones, but of significant size, there were approximately thirty."

The Chase company which issued the notes here involved was organized only a year before the issuance of the notes acquired by the trustee. We believe, however, that Mr. Campbell's testimony sufficiently dispels our notion as to the "newness" of the industry and that this factor by itself would not be a sufficient basis for surcharge.

The conclusion which was reached by Judge Taxis with regard to acquisition in Fisher is applicable in the present instance. We, therefore, adopt the following at 210:

"Based on all of the evidence, the court considers the investment to be an investment purchased in the exercise of that degree of judgment and care, in the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in

the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital."

In reaching this conclusion, it may be pertinent to observe that the investment here involved was made in June 1971, and was in notes, whereas, in Fisher the investment was made after February 14, 1973, and was in shares of stock.

With respect to retention of Chase, the record establishes that Mr. Zink followed its progress and that its retention was given consideration periodically by the trust investment committee.

The main thrust of the objectant's argument is that the trustee failed and neglected to heed certain "warning flags" which should have caused it to consider disposition of the assets long before February 1975.

In preparation for substantiation of his contention, the objectant, Richard Eby, has obviously spent long hours of research, has traveled many miles, and has worked painstakingly. His efforts culminated most strikingly in the production of an unusual exhibit which is replete with information (ARA no. 2). This exhibit measures 10 feet by 18 inches. It includes family history; a table of life expectancy; reprints of analyses of the Chase trust, its notes and offerings; a graph of price and volume movement of the Chase trust notes and shares; and other related information. It is a monument to the perseverence and persistence which have characterized the pursuit. For his assiduous efforts and for his sincerity of intention the court commends and is appreciative of what Mr. Eby has done.

We have mentioned "warning flags." Mr. Eby has diagrammed nineteen flags on the exhibit. It is his contention that each of the flags represents an occurrence or event about which the trustee should have had information if it were performing its duties properly and as a result of which the trustee should have taken some action.

With the exception of the first two flags, all of the flags are within the first nine months of 1974. The notes sold at a premium through April 1973 (N.T. 46). That the earlier period of holding was productive of few flags is attested by the fact that Mr. Eby did not chart the price movement of the Chase notes on Exhibit 3 prior to 1974 because "The price movement didn't seem to be that significant."

The flags consist of articles from publications such as the Wall Street Journal and the New York Times, reports of Merrill Lynch, Pierce, Fenner and Smith, Inc., and annual reports of the trust itself. These are collated in Exhibit 4. Some of the information pertains to REITS generally and to the problems which those in the industry were experiencing. In some instances the information pertains to shares of REITS and in other instances to the Chase notes. Although the articles and reports are negative, the exhibit establishes as late as the last trading day of January 1974 that the high, low and close for the Chase notes was 100. From then until the second week in December there was a steady decline to 69½. Within a week it dropped to 60½ and then by the first week in February it had shot up to 79½, from whence it declined within a week to the price of 72⅜, at which it was sold.

Mr. Crawford testified that the prime interest rate increased four percent from May 1971 to February 1975, and that in his opinion this would more

than account for the depression in the market price of the notes. He pointed out that the oil embargo in October 1973 produced unprecedented circumstances which caused the prime rate to ascend and produced economic stress which was not generally anticipated.

David N. Friedrichs, a general partner of Elkins, Stroud & Supplee, testified about each of the notes acquired by the trustee. He commented on a variety of factors which brought about the decline in the price of the notes. Among the factors which he mentioned were the oil embargo, the increase in the prime rate, the increase in wages and prices, and the general decline in building construction. He expressed the opinion that the conditions would have been most difficult to anticipate. With respect to the Chase notes, he gave his opinion that "there was not sufficient red flag waving to warrant the sale at that distressed price."

Although the objectant has been most insistent that the conduct of the trustee has been wrongful, he has not indicated any specific time at which the retention of the stock imposed an obligation on the trustee to make up the loss. The fact that the notes sold at a premium or at par for two and a half years after issuance cannot be disregarded. During a period of approximately nine weeks in December 1974, and January and February 1975, the notes went from 69½ to 60½, to 79½ and down to 72⅜. This erratic fluctuation made it almost impossible to anticipate what factors would force the price and in which direction the price would go. The fact that Chase Manhattan Bank made a loss reserve addition in February 1975 encouraged investors but did not relieve the existing situation. By then the trustee was holding on to a yo-yo which it disposed

of at a logical opportunity. It was reasonable under the circumstances to retain it rather than to sell it. Upon the death of the life tenant, thereby impelling distribution, it was appropriate to sell and not attempt to recoup that which had been lost.

We conclude our discussion about retention by again resorting to Fisher Trust. We paraphrase at page 215:

Considering all of the evidence, the court concludes that Chase, First Empire and United Jersey were retained by the trustee in the exercise of that degree of judgment and care, in the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital.

## ISSUE II—PAYMENT OF INCOME BY TRUSTEE TO BRITANNIA

During the existence of the trust, the trustee paid all of the net income of the trust to or for the use of Britannia. Mr. Eby has objected to these payments because Britannia had an ample estate. He argues that it should have been exhausted before the trust was used for her comfort, maintenance and support. The practicality which he argues is that inheritance and estate taxes having been paid in Gertrude's estate, the sensible procedure would have been to exhaust Britannia's estate and thereby save death taxes. The legal basis of his argument is that the will required that Britannia be in need of the income or principal or both and that if need there

be, then to use "such amount as is not available for these purposes from my sister's own resources."

The inventory filed in Britannia's estate discloses assets valued at $126,506.53. The income which she received during several years has been stated previously. It amounted to between twelve and fourteen thousand dollars a year. The net United States estate tax is $10,313.

Assets valued at $64,149.64 were awarded to the trustee by the adjudication filed in Gertrude's estate on November 4, 1965. Although the United States estate tax had heretofore been paid in Gertrude's estate, the remainder interest was subject to Pennsylvania inheritance tax at Britannia's death.

The sisters have bequeathed the residue of their estates to the same eight individuals with the exception that Gertrude has added a ninth. If the position advanced by Richard were sustained, the ninth, Eckert S. Eby, would be the main individual to benefit thereby. It is Richard's position that the reduction in taxes would increase an eighth interest in Britannia's estate to more than compensate for the ninth share in Gertrude's estate. We have not attempted to work out the arithmetic thereof, nor are we of the opinion that the duty of the trustee is required to include estate planning.

Gertrude's will provides for the use of income and principal for the "comfort, maintenance and support" of Britannia. The trustee is directed to use such sum as it "in its sole discretion, shall deem necessary, using such amount as is not available for these purposes from my sister's own resources."

The scope of our inquiry about the trustee's exercise of discretion is stated in Briggs' Estate, 150 Pa.

Superior 66, 27 A. 2d 430 (1942), cited by both counsel. The court said:

"Although courts will not substitute their own judgment for the judgment of trustees given discretionary powers, and although we here find no evidence of bad faith or improper motive, the exercise of discretion by trustees is nevertheless subject to the limitation that they must not act outside the bounds of reasonable judgment. In other words, although there is often a wide field within which trustees may determine whether to act or not and when and how to act, yet beyond that field the courts will control them. How wide that field is depends upon the terms of the trust, the nature of the power and all the circumstances."

In Briggs, there is a reference to section 187 of Restatement, Trusts, which was quoted by Mr. Justice Musmanno in Geron v. Kennedy, 381 Pa. 97, 112 A. 2d 181 (1955), as follows: " 'Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion.' "

The gist of the objectant's argument is that the trustee failed to exercise its discretion. Furthermore, it is argued that if discretion was exercised, then there were abuses of discretion.

The question of whether the trustee exercised discretion would have to be answered negatively if the sole testimony to be considered pertained to acts performed by a trust officer or other member of the trust department. The person in charge testified that the bank had received the letter from Britannia

in 1965, and that thereafter it basically relied on H. Lloyd Hess as to the advancements which were made. It is, therefore, necessary that the position of Mr. Hess in this situation be related.

Mr. Hess was a member of the board of directors of the bank from 1951 to 1972. He was a witness to Gertrude's will which was executed in September 1961 and to a codicil signed in October of that year. He described himself as a semi-retired chairman of the board of the Lancaster Malleable Castings Company of which he had formerly been president and general manager.

Mr. Hess testified that Britannia had come to work with his father when he was ten years old "and that was seventy years ago." She continued to work for the father until he passed away in 1933 and then, "she came to work for us." She continued to work at Lancaster Malleable until 1964, when she retired at the age of 80. In describing that she became a pretty good friend of the family, he said, "she babysat for me, she babysat for the children, and she babysat for the grandchildren." He discussed personal and financial affairs with Britannia many times over the forties, fifties and sixties. He discussed their wills with both sisters. He likened the relationship between Britannia and himself as brother and sister.

After Gertrude's death, which was after Britannia's retirement, there was a need that a housekeeper be employed for Britannia. Although she anticipated that she would receive all of the income from the trust, Britannia, nevertheless, feared that she could not afford to employ a housekeeper. Lancaster Malleable did not then have a pension plan. However, it undertook to pay Britannia $75 a week to supplement her other resources and to relieve

her concern about the expense of a housekeeper. Britannia progressed thereafter from a housekeeper, to the hospital, to the nursing home, with constantly increasing expenses.

During the entire period from the inception of the trust to its termination, H. Lloyd Hess, as family friend, was regularly involved with Britannia's problems, an involvement of which he was not particulary fond and which "got to be quite a chore." Robert H. Wonder, the senior trust officer of the bank, administered the trust. It is apparent that most of the information received by him was from Mr. Hess and that the bank relied mainly on Mr. Hess in considering the affairs of Britannia and in making decisions pertaining thereto.

We know of no rule of law which prevents a trust department from relying on one of the members of the board of directors of the bank who is also a member of the trust investment committee. To require that an employe of the bank perform services qua employe which were fully and sufficiently being performed by Mr. Hess qua director and qua friend would, in our opinion, be an utterly fruitless pursuit. We perceive that no one knew Britannia's problems better than H. Lloyd Hess, and no one could have approached their solution with greater understanding. The trustee could not have better utilized the people available to it in any more appropriate way. To send the trust officer to perform what was done by its director, Mr. Hess, would have been akin to using Larry Bowa as a pinch-hitter for Greg Luzinski.

We, therefore, conclude that the trustee did exercise its discretion albeit at times informally and without recorded recommendation and resolution.

Whether the trustee exercised its discretion

within the bounds of reasonable judgment is, in our opinion, required to be answered affirmatively. In Longnecker's Estate (No. 1), 226 Pa. 1, 74 Atl. 616 (1909), the trustee claimed the sum of $4,050 for maintenance of a life tenant who "had an ample independent estate to provide for her every want." The testatrix had provided that the " 'income or so much thereof as may be deemed necessary, be used for the comfortable maintenance and support of my daughter, Harriet Longnecker, who is of weak mind.' " The court said that, "It is not a sufficient answer to the claim of the accountant to suggest that it might or should have been collected from some other estate."

Since the trustee in Longnecker was not required to collect from some other estate, i.e., the estate of the weak-minded life beneficiary, we are compelled to conclude that the present trustee exercised its discretion within the bounds of reasonable judgment. Although it does not bear on the conclusion at which we have arrived, it is noted that there was a reduction of $8,000 in Britannia's individual estate during the period that the bank performed services as her attorney-in-fact.

### ISSUE III—IS THE BANK ENTITLED TO COMMISSIONS FOR SERVICES AS ATTORNEY-IN-FACT OF BRITANNIA EBY IF SHE WAS MENTALLY INCOMPETENT DURING PART OR ALL OF THE PERIOD?

On July 11, 1969, Britannia Eby executed a letter of attorney conferring general and specific powers on the bank. It performed duties thereunder until her death. The evidence establishes that at some

time after the date of the letter of attorney she became unable to manage her property. No proceedings were ever instituted concerning her competency and no court ever adjudged her to be an incompetent person. The letter of attorney was executed five years prior to the adoption of section 5601 of the Probate, Estates and Fiduciaries Act which authorizes the use of a "blockbuster" power of attorney in Pennsylvania.

The objectant does not argue that Britannia was unable to appoint an attorney-in-fact when she executed the letter of attorney. He argues, however, that at some time she became incompetent and that the bank thereafter should not have continued to act under the instrument. It, therefore, must be concluded, so it is argued, that the bank should not be compensated for its services.

It seems to be clearly established that in the absence of a "blockbuster" power of attorney an adjudication of incompetency terminates the authority. See Fulton National Bank, Guardian v. Haldeman, 30 D. & C. 589 (1937); Gertison v. Hull et al., 64 D. & C. 192 (1947); and Restatement 2d, Agency, §122. What is not clearly established is the effect of unpursued existing conditions which, had there been pursuit, would have required the entry of an adjudication of incompetency. We conceive an adjudication of incompetency to be a two-edged instrument. It is a protection to the individual who is the incompetent and it is a protection to the individual who transacts affairs with him. It is a device not solely to provide for the preservation and administration of an estate, but also to provide for the protection of those who undertake to provide services or transact business with the individual. The appointment of a guardian serves as a protection to

the milkman, the nursing home proprietor, the purchaser of assets, to anyone required to act in connection with the affairs of one who is incompetent.

Prior to December 10, 1974, the Incompetents' Estates Act of February 28, 1956, P.L. (1955) 1154, 50 P.S. §3101 et seq., and the Probate, Estates and Fiduciaries Act successively provided that the petitioner for the appointment of a guardian "may be the alleged incompetent's spouse, a relative, a creditor, a debtor or any person interested in the alleged incompetent's welfare." §3301.

Richard Eby visited his Aunt Britey regularly when she was at Village Vista. For several years the visits were frequent, but in later years the frequency decreased because of her apparent lack of understanding. Richard Eby knew that the bank was trustee of Aunt Gertrude's trust, of which he was one of the remaindermen. Prior to her admission to the home he knew that Aunt Britey intended to have Mr. Hess take care of her personal affairs. He knew that the bank was taking care of his aunt's bills at Village Vista.

The objectant knew that at some time his aunt's condition rendered her unable to manage her property and that she lacked sufficient capacity to make or communicate responsible decisions. Richard Eby was within the orbit of those who would be affected by individuals dealing with his aunt. He was an individual on whom the law conferred the right to petition to have her declared incompetent. For an unexplained reason, he never pursued the protection which was available to him. As a beneficiary of Britannia's will, he now asserts an entitlement to a benefit based on the failure of anyone to have pursued the protection available to Britannia

and those who dealt with her or her estate. The attorney-in-fact performed services for which it normally anticipates compensation. We deem that it would be unfair and inequitable to permit acceptance of the services without inquiry and thereafter to base a surcharge on the failure to pursue.

There is another reason that precludes recovery of the commissions by Britannia's estate. The death of the principal, the adjudication of incompetency and other common grounds for the loss of capacity are fixed events. The testimony which has been presented is convincing as to entitlement to an adjudication, but is without sufficient specificity on which to establish a fixed event. We are unable to conclude the date as of which we are asked to make a finding that the powers were terminated. Any finding which we might make as to date would be the result of speculation. This we are not permitted to do.

Before leaving this issue, we note that the bank has acceded to a surcharge of $279.56. By oversight, some of the income received from the Gertrude Eby trust had been subjected to a commission by the attorney-in-fact. The bank recognized that it was entitled to only one commission on income and, therefore, has submitted to a surcharge.

### ISSUE IV—SHOULD THE BANK BE SURCHARGED BECAUSE OF ITS RETENTION, MAINTENANCE AND DISPOSITION OF BRITANNIA EBY'S RESIDENCE AND AUTOMOBILE?

The objectant maintains that the attorney-in-fact retained Britannia's residence and automobile for

too long a time after she entered Village Vista and should be surcharged for costs pertaining thereto.

For some time prior to Britannia leaving the State Street residence, Mary Renninger had lived there as her companion. While Britannia was in the hospital, Mary continued to stay in the property. When Britannia entered Village Vista, she insisted that she have a companion. It was decided that Mary continue to live in the residence and to attend to Britannia at the home. This provided companionship for Britannia and protection for the residence. Mary remained there until 1973 when her services were no longer required. The house was then rented from October 1973 until September 1974, when it become vacant. It became an asset of the testamentary estate upon Britannia's death and was eventually sold by the personal representative in August 1975 for $29,500.

The automobile, a 1963 Oldsmobile, was retained until it was sold on April 28, 1972, for $350. Mr. Wonder testified that it had been retained because of the possibility that Britannia might be coming back and want to use it. Prior to April 28, 1972, it was established that she would not be coming back, whereupon the car was sold.

During this period the car was maintained by a longtime employe who mowed the lawn, shoveled snow, and did other work. At one time Miss Eby had discussed giving him the car but had decided that she would retain title so that she could pay the insurance in appreciation of what he had done for her.

The disposition of the car occurred at an unfortunate time. Several months earlier an expenditure was incurred in repairing the transmission which

was only a few dollars less than the sum for which the car was sold.

The objectant has established sums which were paid by the attorney-in-fact in connection with the house. He contends that the house should have been sold and the expenses eliminated. It is our task to view with foresight, as was required of the attorney-in-fact, and not with hindsight, an opportunity presented to a beneficiary.

Having given consideration to all of the circumstances on which the decision to retain was made, we are unable to conclude that the attorney-in-fact acted beyond the realm of reason. That another might have reached a different answer and adopted a different procedure is not the answer. The standard of care required is that the fiduciary exercise its discretion for the benefit of his principal. We conclude that the bank had a sound basis for its determinations with regard to both the residence and the automobile. The first duty of the attorney-in-fact was to preserve, and this it did until it it was reasonably concluded that the assets would no longer be either needed by or productive for Miss Eby.

The expenses which were established by the objectant would have been eliminated by prompt liquidation of the assets. Whether the comfort of Miss Eby would have been promoted thereby is doubtful. Whether her financial situation would have been improved by an immediate sale has not been established.

In Denlinger Estate, 449 Pa. 393, 297 A. 2d 478 (1972), Mr. Chief Justice Jones quoted with approval a discussion on surcharge in Nemon's Estate, 301 Pa. 425, 429, 152 Atl. 555, 556-7 (1930), as follows:

" 'In Semple's Appeal, 189 Pa. 385, 390, quoting Neff's Appeal, 57 Pa. 91, this court said, "executors, administrators or guardians are not liable beyond what they actually receive unless in case of gross negligence, for when they act as others do with their own goods, in good faith, and they are not guilty of gross negligence, they are not liable," and in Waddell's Estate, 196 Pa. 294, 300, we said "not a single authority is cited, not one can be found which imposes such a penalty as this surcharge, for mere error of judgment." Many other decisions of this court to the same effect might be cited. Here the testimony shows the executors acted with common prudence and common caution and fails to establish negligence or bad faith; at most their failure to dispose of the hotel when first acquired by them was merely an error of judgment for which they are not chargeable.' "

In the present situation the evidence amply establishes that the bank was not grossly negligent and that the bank acted in good faith. If it be concluded that the bank committed error, and we do not reach that conclusion, the error was one of judgment, for which it is not to be subjected to surcharge.