JOHN P. CHASE, trustee, *vs.* ALICE B. PEVEAR & others.

Essex. November 5, 1980. — April 9, 1981.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Practice, Civil,* Master: report of evidence. *Witness,* Expert. *Trust,* Trustee's compensation, Investments, Removal of trustee, Negligence of trustee, Expense of litigation. *Interest. Probate Court,* Counsel fees. *Fiduciary. Judge. Attorney at Law,* Compensation.

Rule 24 of the Rules of the Probate Court was not superseded by Mass. R. Civ. P. 53 but is to be treated as supplementing rule 53. [357-358]

A motion to compel a master to furnish summaries of evidence pursuant to Rule 24 of the Rules of the Probate Court was properly denied where the objections and requests submitted by the moving party were merely argumentative and added little to the facts disclosed by the master's report. [358]

This court declined to pass on a trustee's objections to the admission of testimony by two lawyers as expert witnesses on the propriety of certain investments where the master who admitted their testimony stated that his conclusions would not be different if he excluded it. [358-359]

In a proceeding on a trustee's accounts, a judge's finding that the guardian ad litem had not entered into a contingent fee arrangement with two expert witnesses was not clearly erroneous. [359]

Amounts paid by a trustee to a corporation, of which the trustee was the president, treasurer, and controlling stockholder, for investment consulting services were properly charged to the trust where the trustee took no fee, there was no improper conflict of interest, and the amounts paid were reasonable. [360-361]

In a proceeding on a trustee's accounts, a master's finding that the inheritance tax on future interests in the trust would have been paid from funds obtained from short term Treasury notes if the tax had been paid when due was not clearly erroneous, and, therefore, the trustee should have been surcharged only for the difference between the interest paid the Commonwealth as the result of unexcused late payment of the tax, and the income on the Treasury notes during the period of delay. [361-362]

Discussion of the application of the "prudent man rule" of *Harvard College* v. *Amory,* 9 Pick. 446, 461 (1830). [362-364]

In a proceeding on a trustee's accounts, a finding was warranted that no conflict of interest was shown by the fact that the trustee purchased from trust funds debentures in a real estate investment trust whose trustees were indirect owners of a holding company which had previously purchased the trustee's interest in an investment consulting company.  [365]

In a proceeding on a trustee's accounts, there was no merit to a contention that investment of trust funds in a real estate investment trust was improper because such a trust was "a new concept . . . which had not survived adequate financial testing" where the investment trust had been in existence for at least eight years, was the nation's largest and strongest such trust in assets, with substantially increasing income, and its shares were widely held by institutional investors; on the evidence, however, a finding was warranted that the trustee should be surcharged for holding the investment too long after it became improper.  [365-366]

In a proceeding on a trustee's accounts, the master's subsidiary findings as to the trust funds and financial institutions holding stock in a corporation engaged in insuring mortgage lenders against losses and as to the financial history of the corporation did not support his conclusion that the stock was not a prudent investment when made by the trustee; there was, however, sufficient support for his conclusion that the trustee should be surcharged for holding stock in the corporation after it should have been sold.  [366-367]

Where a trustee had purchased certain debentures in 1970, 1971, and 1972, and the debentures had become a prudent investment at least by 1972, he could not be surcharged for the eventual loss in value of the debentures on the ground that the earlier purchases may have been imprudent when made.  [367-368]

A master's conclusion that a trustee's investment in the stock of a "conglomerate" whose acquisition program had only been in existence for five or six years was imprudent was not supported by his subsidiary findings as to the financial history of the corporation.  [368-369]

The record of a proceeding on a trustee's accounts supported the master's findings that the trustee's investment in a publishing company's stocks, his purchase of certain convertible subordinated debentures, and his investment in the Penn Central Transportation Company on the basis of its nonrail values and earnings were proper.  [369-370]

A Probate Court judge did not abuse his discretion in allowing 6% simple interest on the amount to be surcharged a trustee to run from the dates when losses were sustained in the sale of certain investments.  [370]

A Probate Court judge did not abuse his discretion in removing a trustee on the basis of a master's findings that the trustee was dilatory in filing his trustee accounts and negligent in his delay in paying inheritance

tax and that hostility toward him on the part of the beneficiaries was to some extent justified. [370]

A Probate Court judge was to reconsider the amount of counsel fees and expenses to be awarded the beneficiaries of a trust after a proceeding on the trustee's accounts and an action to remove the trustee where the award in excess of $100,000 was disproportionately high in relation to surcharges of less than $12,000 as found by this court to be proper. [370-372]

Where a trustee successfully defended against charges of making imprudent investments and was surcharged for less than $12,000 for failing to make timely sales, the trustee was entitled to recover from the trust counsel fees and expenses attributable to those issues on which he prevailed. [373-374]

There was no sufficient ground for requiring a trustee personally to pay the fees and expenses of parties opposing the allowance of his accounts. [374]

Where the long course of proceedings with respect to the allowance of a trustee's accounts was to some extent attributable to a letter written by the first probate judge hearing the case to the guardian ad litem, of which the trustee did not become aware until the proceedings before that judge were nearly concluded, the guardian ad litem and the income beneficiaries, who were aware of the letter, were not entitled to recover counsel fees and expenses attributable to the proceedings before the first probate judge. [372-373, 374]


PETITIONS for allowance of a trustee's accounts filed in the Probate Court for the county of Essex on July 23, 1975, and August 25, 1975.

PETITION for the removal of a fiduciary filed in the Probate Court for the county of Essex on November 30, 1976.

The cases were heard by *Mayo*, J., and *Freedman*, J., on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Edward R. Lev* (*Harvey E. Bines* with him) for John P. Chase, trustee.

*Raymond H. Young & James D. St. Clair* for the guardian ad litem.

*John Clarke Kane* for Alice B. Pevear & others.

*Catharine W. Hantzis,* Assistant Attorney General, for the Attorney General.

*Weld S. Henshaw* for Museum of Fine Arts.

*Nicholas U. Sommerfeld, Peter M. Saparoff & Susan E. Johnson,* for The Investment Counsel Association of America, Inc. & others, amici curiae, submitted a brief.

BRAUCHER, J. The trustee of a testamentary trust appeals from a judgment and orders of the Probate Court removing him as trustee, surcharging him in the amount of $119,902.04, plus interest, denying his claim for fees and expenses, and ordering him personally to pay fees and expenses of adverse parties in the amount of $107,896.71. The appeal presents important questions with respect to the application of the "prudent man rule" of *Harvard College* v. *Amory,* 9 Pick. 446, 461 (1830), and a number of subsidiary questions of probate and trust law and practice. We uphold the removal, reduce the amount of the surcharge, and remand the case for reconsideration of fees and expenses in accordance with our opinion.

1. *The proceedings.* The testator, Everett H. Black, died on January 7, 1965. Alfred E. Chase was appointed executor and trustee; he resigned and his first and final account was allowed. Pursuant to the will John P. Chase (trustee), nephew of Alfred E. Chase, was appointed successor trustee on September 24, 1968. In July and August, 1975, the trustee filed his first through seventh accounts, covering the period from September 24, 1968, through December 31, 1974. The income beneficiaries of the trust (Alice B. Pevear, the testator's niece, and her two children) entered an appearance in September, 1975, and in October a guardian ad litem was appointed for minors and persons unborn and unascertained.

The guardian ad litem filed his report on May 26, 1976, recommending surcharges in the total amount of about $114,000, plus interest. In November, 1976, one of the income beneficiaries filed a petition for removal of the trustee. That petition and the accounts were referred to a master on January 18, 1977. The Boston Museum of Fine Arts

(Museum) as remainderman and the Attorney General filed appearances thereafter. Hearings were held before the master on eighteen trial days. The master served his final report of 198 pages plus appendices on May 2, 1978, and filed it in June. He recommended surcharges in a total amount of about $12,000, plus some $25,000 if in the court's opinion there was a sufficient causal connection between two improper investments and the subsequent losses, plus interest. He did not recommend removal of the trustee, stating that removal lay in the discretion of the court rather than the master.

All parties filed objections to the master's report and motions to modify and confirm the report. The guardian ad litem in substance repeated the recommendations he had made in his 1976 report. In September, 1978, without opinion, the probate judge allowed all of the objections of the guardian ad litem and denied conflicting objections of other parties. In October and November orders were entered surcharging the trustee, and decrees removed the trustee and appointed successor trustees. The parties also moved for the award of costs and counsel fees, and counsel fee hearings began December 28, 1978. During a recess, counsel for the trustee discovered a letter from the judge to the guardian ad litem dated May 19, 1976, shortly before the guardian ad litem filed his report. That letter, discussed hereafter, led to the judge's withdrawal from the case on January 10, 1979.

A second judge was assigned to the case, and on March 16, 1979, the second judge vacated all the orders made by the first judge in 1978 except the decrees removing the trustee and appointing successor trustees. After new hearings before the second judge on the objections to the master's report and on costs and counsel fees, the second judge on August 31, 1979, in effect reinstated the orders of the first judge and awarded counsel fees and expenses. This appeal followed, and we transferred the case to this court on our own motion.

2. *The history of the trust.* We summarize briefly the history of the trust as disclosed by the master's report, leaving details for discussion in connection with particular issues. Pursuant to the will income was accumulated and added to principal for six years after the testator's death on January 7, 1965. After January 7, 1971, the income beneficiaries were the testator's niece and her two children. Upon the death of the last survivor of the three, and after pecuniary bequests to named charities, issue then living will become income beneficiaries. The remainder goes to the Museum.

The original executor and trustee employed John P. Chase, Inc. (Company), a registered investment adviser, as a consultant on investments at a cost of $2,000 a year. Early in 1969, a few months after his appointment, the trustee employed the Company under an "advisory agreement" at an annual cost of one half of one per cent of the assets of the trust, or about $9,000 at that time. The trustee was the president, treasurer, chief executive officer and controlling stockholder of the Company. The will contained no provision authorizing the employment of investment counsel, and the guardian ad litem and the income beneficiaries contended that the fees paid to the Company were not chargeable to the trust. The master concluded that the employment of the Company "was prima facie reasonable and necessary" in view of the fact that the trustee took no fee, that there was no improper conflict of interest, and that the amounts paid were reasonable and proper and were properly charged to the trust. He recommended no surcharge on this item.

The Massachusetts inheritance tax on the future interests of the life beneficiaries became due on January 7, 1972, "one year from the date when the right of possession accrues to the persons so entitled." G. L. c. 65, § 7, as appearing in St. 1957, c. 429, § 1. Without excuse, the trustee failed to pay the tax, some $72,000, until May 17, 1974. No penalty was assessed, but interest was paid in the amount of $13,868.63. During the period of delay the securities in the

trust included short term Treasury notes sufficient to pay the tax. If the trustee had paid the tax when due, he would have obtained the funds from those notes, as he did when he paid the tax. The master recommended a surcharge in the amount of the difference between the interest paid and the income on the Treasury notes during the period of delay. That difference came to $1,591.79.

At the death of the testator, his estate consisted of "excessively diversified" common stocks. The will provided that the trustee might retain without liability any investments held by the testator at his death. On his appointment the trustee took over twenty-nine common stocks and ten issues of bonds, debentures and notes. The market value of the trust assets rose from less than $1.8 million at the end of 1968 to more than $2 million at the end of 1972. It then fell to some $1.7 million at the end of 1973, and to $1.24 million at the end of 1974. Of some $630,000 of market value of common stocks held at the end of 1974, about 60% consisted of six blocks of stock held by the testator at his death. During the period from January 7, 1971, to May, 1974, the average annual rate of return on the securities of the trust was 3.5%. At the end of 1974, it was 5.1%.

The guardian ad litem challenged seven specific investments, four of them, amounting to less than 4% of the trust assets, in the "shelter" (housing) industry. In 1970 through 1972 that industry was "in a real growth period" and was a popular area for investors. The stock market "continued to go up through 1968 and many stocks continued on through 1972. However, at the end of 1968 many of the small companies, the more obscure and the medium sized companies were declining in price. . . . The turning point was the end of 1968 but for the first tier, — the stocks most highly regarded, — it was the end of 1972. . . . It cannot be disputed that the stock market sustained a sharp decline throughout 1973 and 1974 . . ., and it was agreed by all parties that the securities of all companies in the shelter industry were included in the sharp decline." A fair

return during the period from 1968 through 1974 would
have been in a range from 3% to 6%, with a higher per-
centage toward the end of the period.

As to the surcharges sought by the guardian ad litem, the
following table shows the master's findings and the rulings
of the probate judge, without interest.

| Item[1] | Guardian (1976) | Master (1978) | Judge (1979) |
|---|---|---|---|
| Advisory fees | $ 13,854.88 | None | $ 13,793.92 |
| Tax interest | 1,558.18 | $ 1,591.79 | 7,803.33 |
| CMI | 7,564.39 | 918.31 | 7,564.39 |
| MGIC | 7,168.16 | 2,898.82 | 7,168.16 |
| Evans Products | 13,531.44 | 13,531.44* | 13,531.44 |
| USI | 12,273.39 | 12,273.39* | 12,273.39 |
| Meredith | 4,769.03 | None | 4,769.03 |
| W.T. Grant | 17,627.60 | 6,315.10 | 17,627.60 |
| Penn Central | 35,370.78 | None | 35,370.78 |
| Total | $113,717.85 | $37,528.85 | $119,902.04 |

*If causal connection sufficient.

3. *Procedural issues.*

a. *Summaries of evidence.* The order referring the case
to the master did not direct the master to file a transcript of
the evidence with his report. Although the master did file
the transcript, it has not been treated by the parties as part
of the record on appeal. Mass. R. Civ. P. 53 (e) (1), as
amended, 367 Mass. 917 (1975). See *Michelson* v. *Aronson*,
4 Mass. App. Ct. 182, 187 (1976); cf. *Spiegel* v. *Beacon Par-
ticipations, Inc.*, 297 Mass. 398, 406-407 (1937) (transcript
considered by judge). Under Rule 24 of the Rules of the
Probate Court (1959) the master furnished the parties with
copies of his draft report in January, 1978, and hearings on
the report were held in March and April. In response to re-
quests of the parties he attached to his final report, served

---

[1] The abbreviations are explained hereafter.

on May 2, 1978, reports of certain of his rulings. The trustee then submitted objections and requests for summaries of evidence pursuant to rule 24. The master, and later the second probate judge, took the view that rule 24 was superseded by Mass. R. Civ. P. 53, 365 Mass. 817 (1974), and the requested summaries were not furnished.

The master and the second probate judge were in error. Rule 24 closely resembles Rule 49 (7) of the Rules of the Superior Court (1976), and both rules are to be treated as supplementing Mass. R. Civ. P. 53. See Mass. R. Civ. P. 83, 365 Mass. 843 (1974); Rule 1 of the Probate Court (1959); cf. Mass. R. Civ. P. 72, inserted by 371 Mass. 910 (1977); New Uniform Practices of Probate Courts of Mass. XV-XVII, as amended through July 1, 1977. The practice under the Superior Court rule has been fully explained in recent opinions of the Appeals Court, and those explanations need not be repeated here. See *Miller* v. *Winshall*, 9 Mass. App. Ct. 312, 313-317 (1980); *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 281-283 (1976); *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 185-190 (1976); J.R. Nolan, Civil Practice §§ 925-935 (1975 & Supp. 1979); J.W. Smith & H.B. Zobel, Rules Practice §§ 53.8-53.11 (1977). We have therefore examined the descriptions of the evidence included in the trustee's objections and requests, and the appended exhibits. The objections and requests occupy forty-three pages, and 111 pages of exhibits are appended; the trustee's presentation is highly argumentative and adds very little to the facts disclosed by the master's report. We conclude that the trustee's motion to compel compliance with rule 24 was properly denied. See *Peters* v. *Wallach*, 366 Mass. 622, 626-627 (1975); *A. Leo Nash Steel Corp.* v. *Southern New England Steel Erection Co.*, 9 Mass. App. Ct. 377, 382-383 (1980), and cases cited.

b. *Expert testimony.* The guardian ad litem called two lawyers as expert witnesses on the challenged investments. The trustee objected that they were not qualified as investment analysts and that it was improper for them to give

opinions on the legal issues in the case. The master admitted their testimony but stated that his conclusions on the propriety of the investments would not be changed if he excluded their testimony. We think we need not pass on the trustee's objections, since the outcome of the case would not be affected. Documents admitted through these witnesses, such as reports of Moody's and Standard & Poor's ratings, were admitted as exhibits without objection.

In the counsel fee hearings before the second probate judge, the trustee sought to show that the lawyer-experts called by the guardian ad litem testified pursuant to a "contingent fee" arrangement. See *Gediman* v. *Sears, Roebuck & Co.*, 484 F. Supp. 1244, 1248 (D. Mass. 1980); *Weinberg* v. *Magid*, 285 Mass. 237, 239 (1934); S.J.C. Rule 3:22, DR 7-109 (c), 359 Mass. 796, 827 (1972). The second probate judge found that the guardian ad litem advised one of the experts that his fee would be subject to court approval, but that he did not enter into any contingent fee arrangement. One of the experts expressed the opinion that "the fee that an expert witness lawyer is going to be paid is to some extent a function of the ultimate success of the people who hire him." Such an opinion is suggestive, but falls short of establishing that the judge's finding was clearly erroneous.

c. *Standard of review of the master's findings.* "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." Mass. R. Civ. P. 53 (e) (2), 365 Mass. 817, 820 (1974). See *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 164 n.7 (1979), and authorities cited. The master's findings of fact are binding on the Probate Court and on us unless mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law. *Jones* v. *Wayland*, 374 Mass. 249, 255 & n.5 (1978). Even where the evidence is not reported and the master's subsidiary findings are not clearly erroneous, however, neither the trial court nor this court is bound by the master's ultimate conclusions. We must apply our own view of the law, and we must consider whether the

master's general findings, on a correct view of the law, are consistent with his subsidiary findings. But even general findings, so far as they are findings of fact, will not be disturbed unless clearly erroneous. *Id.* See *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 180.

4. *Employment of an investment adviser.* The guardian ad litem attacks the employment of the Company as an investment adviser on two grounds; first, that there was a conflict of interest on the part of the trustee, and second, that the total charges for trust services were excessive. The second probate judge upheld both attacks and ordered a surcharge of $13,793.92, the difference between "a high measure of trustee compensation for all comparable services" and the total of $45,066.16 paid to the Company and $13,331.76 paid to a bank for accounting services. The income beneficiaries had sought a surcharge of the entire amount paid to the Company.

It was conceded that it would be perfectly proper for a trustee to employ an investment adviser and to pay him out of the trustee's fee. Here the trustee took no fee, and it is apparent that the guardian ad litem and the judge treated payments to the Company as the equivalent of trustee's fees. As to the amount of the trustee's fee, it is of course obvious that there is a direct and total conflict of pecuniary interest between trustee and beneficiary; that conflict is inevitable and is in no way improper. See *Jackson* v. *United States Trust Co.*, 361 Mass. 333, 338 (1972). The guardian ad litem and the income beneficiaries made an elaborate effort to show that the employment of the Company increased the value of the trustee's interest in the Company, and that the trustee was negotiating a sale of that interest at the time he entered into the advisory agreement with the Company. The master made detailed findings as to the acquisition of the Company by Continental Investment Corporation (CIC) in 1969. He concluded that if there was any conflict of interest on the part of the trustee, "it is so tenuous that I find it was of no effect." That finding is not clearly erroneous.

The master found that the rate charged by the Company was "not excessive or exorbitant"; with few exceptions, its rates "have been on the low side." In *Attorney Gen.* v. *Olson*, 346 Mass. 190, 197 (1963), this court approved the employment of a bank to provide investment advice; since the trustees served without compensation, "the fees paid to the bank under the agency agreement did not place any undue burden on the trust." According to the master, "there is no practice among trustees in the Boston area to hire investment counsel at a charge to the trust in addition to the regular trustee's fee in the absence of express authorizing language in the trust instrument." See *Stillman* v. *Watkins*, 3 Mass. App. Ct. 175, 176 (1975), where a similar finding was made. In *Lipsitt* v. *Sweeney*, 317 Mass. 706, 715 (1945), however, we saw no objection to allowance of a credit to the trustees for services of an accountant, in addition to reasonable trustee's fees. The master's finding that the amounts paid to the Company were reasonable and proper is not clearly erroneous. No objection was made to the amounts paid to the bank for accounting services, and we think the judge was in error in aggregating the accounting fees and the fees for investment advice for comparison with trustee's fees charged by banks. The payments to the Company were properly charged to the trust. See G. L. c. 206, § 16.

5. *Interest on the inheritance tax deficiency.* At the opening of the master's hearings, the trustee offered to reimburse the trust in the amount of $1,591.79 on account of interest paid to the Commonwealth for the period of unexcused delay in paying the inheritance tax due January 7, 1972, and the trustee does not now contest the surcharge in the amount recommended by the master. See *Forward* v. *Forward*, 6 Allen 494, 499 (1863). No contention is now made that the trustee should be liable for the full amount of the interest paid. See *Vredenburgh* v. *Jones*, 349 A.2d 22, 43-44 (Del. Ch. 1975). But the second probate judge struck the master's finding that the tax would have been paid from Treasury notes, and credited the trustee only with the lesser

average rate of return achieved by the trust on all its assets. The master's finding is not clearly erroneous and it should not have been disturbed. During the period in question, the accumulation period had just ended; the trustee would be expected to seek to increase the average income of the trust, and it did increase. We order a surcharge in the amount recommended by the master. *Welch* v. *Welch*, 235 Wis. 282, 326-327 (1940). That amount is to be included in the amount to be credited to principal, in accordance with the master's recommendation.

6. *Investments.*

a. *The "prudent man rule."* In *Harvard College* v. *Amory*, 9 Pick. 446, 461 (1830), this court rejected contentions that insurance and manufacturing stocks were not proper trust investments. We said: "All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." We have since adhered to that standard. See *O'Brien* v. *Dwight*, 363 Mass. 256, 294-295 (1973), and cases cited.

The standard "avoids the inflexibility of definite classification of securities, it disregards the optimism of the promoter, and eschews the exuberance of the speculator. It holds fast to common sense and depends on practical experience." *Kimball* v. *Whitney*, 233 Mass. 321, 331 (1919), where we upheld a trust investment in preferred shares of an unincorporated association organized three years earlier to hold shares of numerous street railway and electric light corporations. We have rejected numerous efforts to establish categories of investments as improper. Cf. *Lovell* v. *Minot*, 20 Pick. 116, 119 (1838) (loan to individual secured by shares in manufacturing company); *Brown* v. *French*, 125 Mass. 410, 417 (1878) (bonds of unfinished railroad at 85% of par); *Hunt, appellant*, 141 Mass. 515, 523

(1886) (discount purchase of time certificate of deposit issued by national bank); *Dickinson, appellant,* 152 Mass. 184, 188 (1890) (shares of Union Pacific Railroad, but second purchase involved too large a proportion of the whole fund); *Thayer* v. *Dewey,* 185 Mass. 68, 70 (1904) (a "small part" of the trust fund, $200,000, invested in Illinois real estate); *Taft* v. *Smith,* 186 Mass. 31, 33-34 (1904) (taking of second mortgage on sale of real estate); *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Soc'y,* 293 Mass. 480, 485-487 (1936) (mortgage participation).

On the other hand, we have held that a disproportionate part of a trust fund should not be invested in a single kind of stock or bonds. *Dickinson, appellant, supra.* Cf. *Davis, appellant,* 183 Mass. 499, 501 (1903) (stock and bonds of same railroad); *Warren* v. *Pazolt,* 203 Mass. 328, 346 (1909) (excessive proportion in single building). We have indicated that investment as a limited partner in a trading partnership would not be proper. See *Kinmonth* v. *Brigham,* 5 Allen 270, 279 (1862). A trustee should not "select a wasting or hazardous investment for the sake of greater present profit." *Id.* at 278. *Creed* v. *McAleer,* 275 Mass. 353, 361 (1931) (mining stocks). *McInnes* v. *Whitman,* 313 Mass. 19, 31 (1943) (same). In such cases and in others we have upheld findings that particular investments were improperly speculative. *Brigham* v. *Morgan,* 185 Mass. 27, 36 (1904) (housing development in Kansas). *Roulston* v. *Roulston,* 285 Mass. 489, 491 (1934) (bonds). Where the question is whether to sell a trust investment on a falling market, we have characterized the decision as "a perplexing one." *New England Trust Co.* v. *Paine,* 317 Mass. 542, 555 (1945), quoting *Kimball* v. *Whitney,* 233 Mass. 321, 334 (1919), and cases cited. Nevertheless, we have enforced by surcharge a duty to dispose of improper investments within a reasonable time. *McInnes* v. *Whitman,* 313 Mass. 19, 30 (1943).

From these cases the trustee argues, we think correctly, that investment management practices are not to be restricted by artificial legal barriers, fixed rules or definite

classifications. In particular he argues that an investment should not automatically be held improper because of lack of "seasoning" for some minimum period, because of the line of business, such as Real Estate Investment Trusts (REITS) or "conglomerates," because of ratings by services such as Moody's or Standard & Poor's, because of the recommendations of the investment adviser, or because of price history. He then argues that both the master and the second probate judge employed such criteria. While we agree that inflexible rules are to be avoided, we think the elements referred to may properly be taken into account as factors in determining what is prudent. That is what the master purported 'to do, and we must examine the particulars.

The trustee must exercise prudence in making or retaining each investment, and is chargeable with any loss by failing to do so. *Creed* v. *McAleer*, 275 Mass. 353, 362 (1931). But, at least where the propriety of the investment presents a close question, we have considered whether the trust fund suffered by reason of the challenged feature of a particular investment. *First Nat'l Bank* v. *Truesdale Hosp.*, 288 Mass. 35, 45 (1934). Moreover, in deciding what is prudent, the cases "warrant some regard being had to the administration of the fund as a whole." *Green* v. *Crapo*, 181 Mass. 55, 61 (1902). "The record of any individual investment is not to be viewed exclusively, of course, as though it were in its own water-tight compartment, since to some extent individual investment decisions may properly be affected by considerations of the performance of the fund as an entity . . . . The focus of inquiry, however, is nonetheless on the individual security as such and factors relating to the entire portfolio are to be weighed only along with others in reviewing the prudence of the particular investment decisions." *In re Bank of N.Y.*, 35 N.Y.2d 512, 517 (1974).

b. *The shelter industry.* In 1970, 1971, and 1972, the trustee bought the four challenged shelter industry investments: convertible debentures issued by Continental Mortgage Investors (CMI) and Evans Products Company and

common stock of MGIC Investment Corporation (MGIC) and U.S. Industries, Inc. (USI). These investments, together with stock in Johns-Manville Corporation, amounted to about 4% of the trust assets, and the master found that a 4% investment in the shelter industry was prudent "if the type of security and the particular companies were properly chosen." He found that the CMI investment was proper, but that the trustee should be surcharged for holding it too long after it became improper. The MGIC shares, he found, were not a prudent investment in 1970, but they rose phenomenally in value; the trustee should be surcharged because he held them too long. He found that Evans Products and USI were not prudent investments, but he left for the court the question in each case whether there was a sufficient causal connection between the impropriety and the loss. We consider each investment separately.

c. *CMI.* The second probate judge ruled that the purchase of CMI debentures involved a conflict of interest on the part of the trustee. In 1969 the Company became a subsidiary of CIC, and the trustee became stockholder and director of CIC. CIC was a holding company, and two brothers named Wallace were its principal officers and indirect owners of a controlling interest. The Wallace brothers were trustees of CMI and beneficial owners of a company that was investment adviser to CMI. The trustee had no interest in CMI at the time he bought its debentures, and neither CMI nor CIC had any investment in the other company. The master found no conflict of interest and no indirect profit or benefit to the trustee from the purchase. Those findings are not clearly erroneous.

Apart from the claim of conflict of interest, we reject the contention of the guardian ad litem that investment in CMI was improper because it was a REIT, "a new concept invited by an Internal Revenue Code provision which had not survived adequate financial testing." See *Eby Estate*, 6 Pa. D. & C. 3d 371, 377-386 (1977). We also reject the objection that management fees were doubled up. See Shattuck, The Legal Propriety of Investment by American Fiduciaries

in the Shares of Boston-type Open-end Investment Trusts, 25 B.U. L. Rev. 1, 22-23 (1945); 3 A. Scott, Trusts § 227.9A (3d ed. 1967). The master found that CMI was formed in 1962 and was the nation's largest and strongest REIT in assets, with substantially increasing income, and that its shares were widely held by institutional investors. Common trust funds were investing in REITs and in convertible debentures in increasing amounts, and by May, 1973, the CMI debentures were held by eleven common trust funds. He concluded that the investment was proper, and we agree.

CMI's income was derived primarily from mortgage loans; it made a profit from the spread between its borrowing costs and its lending yield. It was believed in the trade that REITs could be operated profitably if the prime rate did not exceed 9%. As interest rates climbed in 1973 and 1974, difficulties arose. In December, 1973, the trustee was compelled to exchange $10,000 of debentures for 867 shares of beneficial interest. In January, 1974, when the shares were selling at $10, the Company listed the shares for mandatory sale. The trustee sold 400 shares in May, 1974, and the other 467 shares in July. The master concluded that all of the shares should have been sold in May, and recommended a surcharge in the amount of $918.31, the additional amount that would have been realized by a May sale. That conclusion is supported by his subsidiary findings, and we accept the master's recommendation.

d. *MGIC.* The trustee lost $7,168.16 on MGIC stock purchased in 1970 and sold on December 31, 1974. MGIC was primarily engaged in insuring lenders against losses on residential mortgage loans, and was the largest insurer of private residential mortgage loans. It was incorporated in 1968, but was in business for some years before that, and had a good record of growth and earnings. The master concluded that the stock was not a prudent investment, chiefly because of the lack of adequate "seasoning," and because it was not held by any common trust funds nor by an impressive number of financial institutions. That conclusion

is not supported by the master's subsidiary findings: 94
financial companies held some 4.5 million shares, and an
exhibit in the record shows that by the end of 1973 the stock
was held by 33 common trust funds. The finding of lack of
"seasoning" apparently rests on the incorporation in 1968,
disregarding the prior history, and on expansion into sub-
sidiary lines of insurance, some of them unsuccessful, after
1968. We think the subsidiary findings require the con-
clusion that the investment was prudent when made. We
do not adopt the master's ruling that a subsequent increase
in value would preclude surcharge if the investment re-
mained improper and ultimately resulted in a loss. See 3
A. Scott, Trusts § 213.2 (3d ed. 1967).

The master concluded that the trustee should be sur-
charged in the amount of $2,898.82 for failing to sell the
stock in August, 1974. He relied on "disquieting informa-
tion" contained in a prospectus issued in October, 1973, and
on the Company's listing of the stock as strongly recom-
mended for sale in August, 1974. We think the master's
conclusion is sufficiently supported by his subsidiary find-
ings, and we adopt it.

e. *Evans Products.* The trustee purchased $20,000 of
convertible subordinated debentures issued by Evans Prod-
ucts Co., $10,000 in December, 1970, $5,000 in July, 1971,
and $5,000 in October, 1972. He sold them in November
and December, 1974, at a loss of $13,531.44. The master
found that Evans Products became a "conglomerate" in a
program begun in 1965, that this period was not a suf-
ficiently long period of "seasoning," that its stock and de-
bentures were given "speculative" ratings by Moody's and
Standard & Poor's, and that relatively few financial insti-
tutions and common trust funds held the stock. He con-
cluded that the purchases were not prudent, and recom-
mended a surcharge in the amount of the loss if a sufficient
causal connection was found by the court. If the invest-
ment was proper, however, he recommended that no sur-
charge be made because of the timing of the sales.

Evans Products was incorporated in 1923, and had a record of marketing strength and growth, an uninterrupted dividend record since 1964, with increases every year, and excellent profit margins. Its revenues practically doubled from 1966 to 1969. Whatever the situation as to "seasoning" in 1970, it seems clear that the debentures had become a prudent investment by 1972, when the trustee made his third purchase. By the end of 1972, almost 2.5 million shares of the stock into which the debentures were convertible were held by 37 financial institutions. Early in 1973 the Company listed the stock as "attractive for purchase." "After the investment has become a proper trust investment it would be absurd to require the trustee to sell it if he could immediately properly repurchase it." 3 A. Scott, Trusts § 230.5 (3d ed. 1967). We conclude that there should be no surcharge with respect to the Evans Products debentures.

f. *USI.* The trustee made three purchases of USI stock in August and November, 1971, and April, 1972, at a total cost of more than $21,000. He sold the stock in September, 1973, at a loss of $12,273.39. The master found that USI became a "conglomerate" in 1965 and concluded that its great number of different lines of business and services made it a "businessman's risk" rather than a proper trust investment. Moreover, despite a favorable financial record, its acquisition program had been in existence only five or six years before the purchases, "insufficient seasoning" for a trust investment. He recommended a surcharge for the entire amount of the loss, subject to the court's ruling on the question of causation. If the investment was proper, however, he recommended no surcharge because of delay in selling.

The master's subsidiary findings include findings that USI revenues, earnings, dividends and stock price had increased after 1966, that by the end of 1972, 54 financial institutions held nearly 5 million of its shares and ten common trust funds held it, and that the Company listed the stock at the times of the purchases as "can be purchased for accounts

with longer term objectives." As in the case of Evans Products, we reject any rule that "conglomerate" stock cannot be a prudent investment or that a fixed period of "seasoning" is required. We conclude that the investment was prudent and is not a subject for surcharge.

g. *Meredith, Grant and Penn Central.* The remaining investments in controversy are purchases of Meredith Corporation stock in 1967, debentures of W.T. Grant Co. in 1972, and stock of Penn Central Transportation Company in 1967 and 1968. The master concluded that all of these purchases were prudent, but recommended a surcharge of $6,315.10 because the Grant debentures should have been sold within six months after the Company, in November, 1973, "strongly recommended" sale. We adopt the master's findings, conclusions and recommendations as to those investments, and see no need to repeat them. But we discuss briefly the contrary contentions of the guardian ad litem, which were adopted by the probate judge.

As to Meredith Corporation, the principal objection is that publishing stocks were not generally held by trustees but were regarded by the trust community as "volatile and imprudent investments because of the tendency of the public to shift from one like to another like." The master noted this objection, but did not adopt it. We think his contrary finding was not clearly erroneous.

The objections to the Grant debentures, before 1973, seem to be objections to all convertible subordinated debentures. We reject any rule that would render all such investments unsuitable as a matter of law. Price controls imposed in August, 1973, and rising interest rates had a serious adverse impact on all retail organizations, including Grant, and its stock declined in price beginning in October, 1973. Only then did a serious question arise.

The judge characterized the Penn Central investment as "a speculation," primarily because the trustee relied on real estate and other non-rail values and earnings. But the master found that others did the same, and that the stock was widely held, in 1968, by financial institutions and com-

mon trust funds. We accept those findings, and the con-
clusion follows that the investment was properly made.

7. *Interest.* The allowance of interest on the amount of
surcharge is largely within the discretion of the Probate
Court. See Restatement (Second) of Trusts § 207 (1959);
3 A. Scott, Trusts § 207.1 (3d ed. 1967). The master
recommended that 8% interest run from date of final
decree or from the date appearances were filed by the
beneficiaries in opposition to the allowance of the trustee's
accounts. Cf. G. L. c. 231, §§ 6B, 6C. The probate judge
allowed 6% simple interest from the dates when losses were
realized by sale, citing *National Academy of Sciences* v.
*Cambridge Trust Co.*, 370 Mass. 303, 311 (1976). See
G. L. c. 107, § 3. We find no abuse of discretion, but the
amounts must of course be recomputed in accordance with
our decision.

8. *Removal of the trustee.* The master made detailed
findings with respect to the removal of the trustee, and con-
cluded that he acted in good faith and in accordance with
his best judgment at the time, despite mistakes of judgment.
The master found that the trustee was dilatory in filing his
trustee accounts and negligent in his delay in paying inheri-
tance tax, and that there was hostility toward him on the
part of the beneficiaries, to some extent justified. It was
clear to the master that "it would be better for the future
administration of the Trust if Mr. Chase were no longer
Trustee," but the decision lay in the discretion of the Pro-
bate Court rather than the master.

The first probate judge removed the trustee, and the sec-
ond probate judge refused to vacate the decree of removal.
We find no abuse of discretion. G. L. c. 203, § 12. *Cooney*
v. *Montana*, 347 Mass. 29, 38 (1964). Compare *Shirk* v.
*Walker*, 298 Mass. 251, 259-260 (1937), with *Comstock* v.
*Bowles*, 295 Mass. 250, 260 (1936).

9. *Counsel fees and expenses.*

a. *The judge's decision.* The second probate judge held
several days of hearings on counsel fees and expenses. He
denied in its entirety the trustee's application for payment

out of the trust of more than $200,000 in counsel fees and expenses, on the grounds that the litigation was necessitated by the trustee's breach of duty and that the trustee's conduct had not benefited the trust, citing G. L. c. 215, §§ 39A, 39B, 45; *Lane* v. *Cronin*, 345 Mass. 52 (1962); *Friedman* v. *Hazen*, 328 Mass. 233 (1952). The judge also allowed counsel fees and expenses in the following amounts, to be paid by the trustee individually: to the guardian ad litem, $69,041.51; to the income beneficiaries, $33,855.20; and to the Museum, $5,000; a total of $107,896.71.

Such awards generally lie in the discretion of the Probate Court. See *National Academy of Sciences* v. *Cambridge Trust Co.*, 370 Mass. 303, 311-312 (1976). But the fees and expenses seem high in relation to the judgment entered by the judge on the merits, and the modifications we are ordering would make the disproportion even more dramatic. An award of fees and expenses in excess of $100,000 in obtaining surcharges in a total amount of less than $12,000 (plus interest) suggests a serious question as to the necessity for the services rendered. Accordingly, we have reviewed the allowances, and we conclude that they should be reconsidered in accordance with the guidelines stated below. See *Paone* v. *Gerrig*, 362 Mass. 757, 763-764 (1973).

b. *Charges and countercharges of misconduct.* The charges of impropriety on the part of the trustee in the employment of an investment adviser and in investing in CMI have been rejected in the above discussion, as has the countercharge that the guardian ad litem made contingent fee arrangements with two expert witnesses. The second probate judge properly rejected the trustee's further contention that it was improper for the guardian ad litem to participate in the proceedings as counsel in his own behalf. Cf. *Corcoran* v. *Thomas*, 6 Mass. App. Ct. 190 (1978) (legal services of administrator); *Blake* v. *Pegram*, 109 Mass. 541, 553-554 (1872) (legal services of trustee). We also agree with the second probate judge in attaching no consequences to conversations between the guardian ad litem and an assistant register of probate or to an angry

statement of the guardian ad litem in a telephone conversation with counsel for the trustee.

Serious attention must be given, however, to the letter of May 19, 1976, from the first probate judge to the guardian ad litem, referred to earlier in this opinion as the basis for that judge's withdrawal from the case in January, 1979. Before the filing of his report, which recommended surcharging the trustee more than $100,000, the guardian ad litem submitted a copy to the first probate judge. The judge then wrote the letter in question: "Dear Ray: In my thirty-seven years at the bar, I have seen probably hundreds of guardian ad litem reports, while I was in private practice and since I have been here, but I have never seen one that even approximated the superb job you have done in the above estate. It is absolutely magnificent and your conclusions show the advisability and necessity of having guardians ad litem who are knowledgeable and with expertise . . . ."

Shortly after the guardian ad litem was appointed in October, 1975, counsel for the income beneficiaries informed him that "we had decided not to be critical of the investment performance provided we reached an agreement on the question of apportionment of fees and the question of the Inheritance Tax interest," and that he and counsel for the trustee had tentatively reached such an agreement. About a week after he received the judge's letter in May, 1976, the guardian ad litem sent a copy of the letter to counsel for the income beneficiaries. Neither of them disclosed the letter to counsel for the trustee. Counsel for the income beneficiaries testified that he "was glad that the judge saw the case the same way I did," and thereafter he joined the guardian ad litem in the contentions made in the further proceedings.

After the master's report was filed in June, 1978, the first probate judge heard all the motions concerning the report; he adopted the motion of the guardian ad litem in its entirety, without opinion, despite the fact that the motion requested relief in the alternative. He removed the trustee,

appointed successor trustees, and heard and denied a motion to recuse him because he had once represented the trustee. In December, 1978, at a hearing on counsel fees, counsel for the trustee learned of the judge's letter. A few days later the judge withdrew. The second probate judge was assigned to the case, and the orders of the first probate judge were reargued and decided a second time. The second probate judge found that the guardian ad litem had forgotten about the letter, and that he never considered it an expression of the views of the first probate judge on the merits of the case.

It is of course clear that the letter of May 19, 1976, should not have been written. See *Matter of Bonin*, 375 Mass. 680, 706-707 (1978). It is equally clear that the first probate judge properly withdrew from the case when the letter was called to his attention. It seems to us that the guardian ad litem and counsel for the income beneficiaries should have recalled the letter in the fall of 1978, when they found themselves arguing a bitterly contested matter before a judge who had expressed, in advance, such enthusiasm for their cause. They should have disclosed the letter to the judge and to counsel for the trustee, and thus should have avoided the necessity for repeating the hearings before a second probate judge.

c. *The trustee's counsel fees and expenses.* In general a trustee is entitled "to look to the trust fund for the reasonable cost of making a successful defence against charges of maladministration brought against him without fault on his part." *Gordon* v. *Guernsey*, 316 Mass. 106, 110 (1944), and cases cited. See G. L. c. 206, § 16. Here the trustee has successfully defended against all charges of making imprudent investments, and is surcharged less than $12,000 (plus interest) for failing to make timely sales. We have recognized that the "decision of the question whether to sell an investment of trust funds on a falling market is a perplexing one." *Kimball* v. *Whitney*, 233 Mass. 321, 334 (1919). Complete success on the merits is not a prerequisite to the recovery of fees and expenses. *Crowell* v. *Styler*, 314 Mass.

122, 125 (1943). We conclude that the trustee's counsel fees and expenses should be apportioned between those issues on which he prevailed and those for which his mistakes of judgment were responsible. *Gordon* v. *Guernsey*, 316 Mass. 106, 110-111 (1944). Amounts attributable to the former are to be charged to the trust.

d. *The counsel fees of the guardian ad litem and the beneficiaries.* We do not think the guardian ad litem or the beneficiaries should be precluded from the recovery of fees and expenses on the ground of misconduct, but we find no sufficient ground for requiring the trustee to pay the fees and expenses of the opposing parties personally. The counsel fees of the Museum are unobjectionable, and should be paid from the trust.

As for the guardian ad litem and the income beneficiaries, there should be no allowance for counsel fees and expenses attributable to the proceedings before the first probate judge after the filing of the master's report. On remand there should be "the most careful scrutiny" of the remaining charges, leaving "no doubt, either as to the reasonableness of the charge or the propriety of the service." *Blake* v. *Pegram*, 109 Mass. 541, 553-554 (1872). Particular attention should be given to the necessity for the services and to the extent of duplication of effort involved. See *Paone* v. *Gerrig*, 362 Mass. 757, 760-761 (1973). The counsel fees and expenses found to be warranted, including the charges of the expert witnesses called by the guardian ad litem, are to be charged to the trust.

10. *Recapitulation and disposition.* The trustee is to be surcharged in the following amounts:

| | |
|---|---:|
| Tax interest | $ 1,591.79 |
| CMI | 918.31 |
| MGIC | 2,898.82 |
| W.T. Grant | 6,315.10 |
| Total | $11,724.02 |

Interest is to be added at 6% from the dates when losses were realized. The decrees removing the trustee and appointing successor trustees are affirmed. Counsel fees and expenses are to be awarded in accordance with this opinion, payable out of the trust estate to the trustee, the guardian ad litem and the beneficiaries. The costs and expenses of this appeal may be allowed in the discretion of the Probate Court.

The judgment appealed from is reversed and the case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*