THE FIRST NATIONAL BANK OF BOSTON, trustee, *vs.* PETER ALOISI, guardian.

Suffolk. April 9, 1985. — August 16, 1985.

Present: ARMSTRONG, KAPLAN, & KASS, JJ.

*Trustee*, Investments. *Fiduciary*.

A common trust fund did not, in the circumstances, sustain a loss by reason of the trustee's sale at market price of certain bonds held by the fund, which, at the time of the sale, had dropped in value from their acquisition price, since the net asset value of the fund, and hence the value of the units held by any participant, were unaffected by the sale. [616]

In a proceeding for allowance of the accounts of the trustee of a common trust fund, the judge erred in surcharging the trustee on the ground that it had sold certain bonds rather than others held by the fund, where there was uncontradicted evidence as to the reasonableness of the investment criteria the trustee had applied. [617]

PETITION for allowance of trustee's accounts, filed in the Suffolk Division of the Probate and Family Court Department on January 24, 1978, and March 5, 1981.

The case was heard by *Robert L. Yasi*, J.

*George Marshall Moriarty* (*Steven A. Kaufman* with him) for the plaintiff.

*Ralph R. Bagley* (*Frances Blaum-Naughton* with him) for guardian ad litem.

KASS, J. Upon the objection of a guardian ad litem to an account filed by The First National Bank of Boston, as trustee of a common bond fund, a Probate Court judge surcharged the bank $205,326 on the ground that it had imprudently sold bonds in the trust fund's portfolio. The bank has appealed. We are of opinion that the bank acted with reasonable prudence and reverse the Probate Court's judgment.

Few statements of law have enjoyed as long a life, essentially unmodified, as that which was announced in *Harvard College* v. *Amory*, 9 Pick. 446, 461 (1830), and which might now be renamed the "Prudent Person Rule." The rule applies the following test to the legal propriety of investment decisions: "All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." *Id.* at 461. The rule finds expression in Restatement (Second) of Trusts §§ 174 and 227 (1957).

The facts are not disputed.

Acting under G. L. c. 203A, § 3, and G. L. c. 206, § 24, the bank, as trustee of Old Colony Trust Company Common Trust Fund "B" (the "Fund"), petitioned for allowance of the Fund's fourteenth through twentieth accounts, covering seven annual periods through September 30, 1980. The Fund is a common trust fund established under a plan and declaration of trust dated November 17, 1960.[1] It serves as a vehicle for investments by other trusts, estates, guardianships, and conservatorships of which the bank is a fiduciary. At times relevant to this action, there were approximately 1,790 individual fiduciary accounts participating in the Fund. By § 1.2 of the trust instrument, the Fund's primary fields of investment are bonds, notes, debentures, other evidences of indebtedness, and preferred stocks.[2]

Under § 3.1 of the declaration of trust, participation in the Fund consists of "units representing equal interests in this Fund and without priority or preference one over the other." Section 5.5 provides that the value of a unit is periodically[3] computed

---

[1] See generally c. 203A, the Uniform Common Trust Fund Act.

[2] At the time of the action, the Fund had no investment in preferred stock.

[3] On valuation dates which occurred at the end of calendar quarters, i.e., the last business day of March, June, September and December.

by dividing the market value of the principal of the Fund by the number of units into which the Fund is then divided. For example, if on a valuation date the principal of the fund stood at $2,000,000 and there were 1,000 units outstanding, the value of a unit would be $2,000. Managers of the participating trusts could redeem units on the quarterly valuation dates. Those managers arrived at their decisions to redeem in accordance with the requirements of the various trusts on behalf of which they acted. This meant that on a given valuation date the cash drain of redemptions in the Fund might exceed cash from unit purchases or uninvested cash retained in the Fund against quarterly draws. Drain on the Fund was more likely when the bond market was weak.

Such, precisely, were the circumstances at the close of the first calendar quarter in 1980. Interest rates were high and the bond market was sagging. Redemptions of units exceeded purchases of units by $1,100,000. After all liquid assets in the Fund had been applied, there was still a shortfall which the Fund had to meet through the sale of securities.[4] The manager of the Fund elected to sell for $579,040 a lot of Exxon debentures, due November 1, 1997, which had a face value of $1,000,000.[5] The Fund had acquired the bonds for $861,445, and so realized a loss of $282,405 on the sale.

That loss, the guardian ad litem objected, was imprudently sustained. His position was that if bonds had to be sold, the Fund manager should have sold a round lot of Standard Oil of Indiana bonds due September 15, 1991, a transaction by which the realized loss would have been $205,326 less than had been sustained by the sale of the Exxon bonds. That view persuaded the judge, who found: "The Exxon sale resulted in the loss of $282,406 . . . . The [F]und manager could have sold Indiana bonds at a loss of $77,080 . . . . Exxon and

---

[4] The precise amount of the shortfall is a fact about which the parties differ. The bank puts the shortfall at $395,000. The guardian ad litem sets it at $135,000. For our analysis, the difference does not matter.

[5] Bonds are usually sold by institutional investors in round lots of $1,000,000 to obtain a better price.

Indiana were substantially equally rated . . . . There was a loss of $205,326 resulting from the choice made by the manager . . . . The Court finds that the choice was imprudent, lacked sound discretion and offended the rule of *Harvard College* v. *Amory*."

1. *Whether the Fund sustained a loss.* Before we consider the prudence of the sale of the Exxon bonds, we pause to consider whether the act of sale saddled the Fund with a loss at all. Prior to sale the Exxon bonds had already dropped from their acquisition price. On the pertinent valuation date, at the end of the first quarter in 1980, the Fund carried the bonds at their market price, around $579,040. When the fund sold the Exxon bonds it simply substituted cash for the security. The value of units of a participant in the Fund did not vary by reason of the transaction because the net asset value of the Fund remained constant. Participants in the Fund buy and sell units on the basis of that net asset value, not the value which the fund paid for the assets. Realization by sale of the loss which the Fund had already experienced on the market with the Exxon bonds — or any security it held — had no effect on the unit holders.

This is not to say that a trustee cannot, through unwise management, cause a loss to a common trust fund. The trustee may cause loss by retaining a security an unreasonably long time, *McInnes* v. *Whitman*, 313 Mass. 19, 29-30 (1943), or by speculating in unsound bonds. *Roulston* v. *Roulston*, 285 Mass. 489, 491 (1934). See also *Chase* v. *Pevear*, 383 Mass. 350, 362-363 (1981), and cases cited. Generally, though, loss in a trust develops over a period of time and is related to decisions to buy, hold or sell on the basis of the worth of the security. Short of hypothesizing so unlikely a set of facts as the sale of a security in the face of information that it will infallibly rise within a short time, loss does not occur by reason of the final step of sale of the security.[6]

---

[6] If one followed the logic of the guardian ad litem's position, it would be a mistake to sell a depreciated bond before maturity if the sale of another would produce a smaller book loss, even if a further drop in market value of the bond could reasonably be anticipated.

2. *Was the sale of the Exxon bonds imprudent?* The manager of the Fund offered the following reasons for his sale of the Exxon bonds rather than the Indiana bonds: (1) the Exxon bonds had a longer maturity than the Indiana bonds and, in the falling market conditions which prevailed in 1980, bonds with longer maturities were less desirable; (2) the Exxon bonds had a less active sinking fund (45%) than the Indiana bonds (70%), which meant that the Exxon bonds would be weaker in a falling market because of the lesser likelihood of being redeemed before maturity;[7] (3) the balance in the holdings of the Fund would have been adversely affected by the sale of $1,000,000 face value of Indiana bonds, which constituted all of the Indiana bonds that the Fund held, rather than by the sale of the same amount of Exxon bonds, which would have left $2,500,000 of those bonds in the Fund; (4) the economic outlook of Standard Oil of Indiana was more favorable than that of Exxon because of an aggressive exploration program and a larger share of stable domestic earnings.

No evidence was introduced which contradicted those criteria for judgment; much evidence was introduced which supported them. Subsequent events, to be sure an uncertain guide to the reasonableness of investment judgment, buttress the investment decision here made. The Indiana bonds were sold on May 23, 1980. Between the date of sale of the Exxon bonds and May 23, both bonds went up, but the Indiana bonds went up $20,500 more. Thus, if the Indiana bonds had been sold first and the Exxon bonds held, the net asset value of the Fund would have been lower.

We have no doubt that the bank applied reasonable investment criteria and acted prudently, i.e., on information, *Bowker* v. *Pierce*, 130 Mass. 262, 264 (1881), and for a proper purpose. *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Soc.*, 293 Mass. 480, 488 (1936). See generally *Chase* v. *Pevear*, 383 Mass. at 362-364. On the view we take of the case, we need

---

[7] Bonds redeemed by the issuer before maturity are redeemed at full face value. Therefore, the bond that is more likely to be redeemed than another is more attractive when the market values of bonds generally are down.

not consider the judge's observation that the bank's procedures gave too short notice of cash demand to the Fund manager and impliedly required him to act on a crisis basis. Parenthetically, there was no evidence that the manager had acted on a crisis basis, or that more lead time would have been of assistance in making a decision about what securities to sell.

The judgment is reversed, and a judgment shall be entered allowing the bank's fourteenth through twentieth accounts as stated.

*So ordered.*