NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

21-P-770 & 21-P-812                                Appeals Court


ANNIKA KARIN IMBRIE[1] vs.  GREGORY ADAIR IMBRIE.


Nos. 21-P-770 & 21-P-812.

Middlesex.     October 11, 2022. – May 2, 2023.

Present:  Sacks, Hand, & Grant, JJ.


Divorce and Separation, Arbitration, Alimony, Child custody,
    Child support, Division of property, Findings, Parent
    coordinator.  Arbitration, Divorce and separation, Judicial
    review, Authority of arbitrator.  Parent and Child,
    Custody, Child support.



Complaint for divorce filed in the Middlesex Division of
the Probate and Family Court Department on November 28, 2016.

The case was heard on the report of an adjudicator by
Michael D. Anderson, J.


Martin F. Kane, II (Johanna Gibson also present) for the
wife.
Amanda Vanderhorst for the husband.

---

[1] We acknowledge that the wife has resumed using her birth
name; however, we adhere to our practice of setting forth the
parties' names as they appear in the complaint for divorce.

HAND, J.  These cross appeals stem from highly contentious divorce proceedings between Annika Karin Imbrie (the wife) and Gregory Adair Imbrie (the husband).  By agreement, the parties submitted the matter for "private adjudication" to a retired Probate and Family Court judge (adjudicator), who heard evidence and submitted a draft judgment and findings of fact for review by a judge of the Probate and Family Court (judge).  The judge issued a judgment of divorce nisi (divorce judgment) adopting nearly wholesale the adjudicator's draft findings and judgment, making only minimal changes.  Both parties contend, with one exception discussed infra, that the judge, in reviewing the adjudicator's draft judgment and findings, erroneously applied the extremely deferential standard applicable to binding arbitration under Gravlin v. Gravlin, 89 Mass. App. Ct. 363 (2016), rather than the less deferential standard applicable to proceedings involving masters under Mass. R. Dom. Rel. P. 53 (rule 53).

We conclude that because the parties agreed to proceed under the standard applicable to proceedings involving masters under Rule 53 and did not agree to submit the case to binding arbitration, it was error for the judge to defer to the adjudicator's rulings under the standard applicable to binding arbitrations.  See Gravlin, 89 Mass. App. Ct. at 365-366.  We further conclude that the judge exceeded his authority in

adopting the adjudicator's ruling requiring the use of a parenting coordinator (PC).  Accordingly, we vacate so much of the divorce judgment as pertains to legal custody regarding medical decisions for the children, the PC, and the parenting plan, and remand the case to the probate court for further proceedings consistent with this opinion.  The divorce judgment is affirmed in all other respects.

Background.  1.  General background.  We summarize the adjudicator's relevant findings, supplementing them with undisputed facts in the record, and reserving other facts for later discussion.  See Pierce v. Pierce, 455 Mass. 286, 288 (2009).  The parties were married in 2000 and had three children together during the marriage (born in 2007, 2009, and 2013, respectively).  The wife is a patent attorney, and the husband is a cardiologist.  The parties enjoyed an upper middle-class lifestyle during the marriage, in part because of generous financial contributions from the wife's parents.[2]

---

[2] The wife's parents paid for the parties' graduate school educations and the children's private school tuition.  The parties also enjoyed regular vacations and the assistance of an au pair during the marriage.  In 2010, the parties bought a "high end home" in Newton for $1.7 million with the help of a $1.55 million private mortgage given to the wife's parents.  The parties made monthly mortgage payments of approximately $2,000, and the wife's parents forgave approximately $20,000 in mortgage principal each year.

In 2010, after the husband completed his medical residency, the parties and their children moved to Massachusetts and the husband began a fellowship position in the Boston area. In 2012, after the wife completed law school, she accepted an associate position at a Boston law firm, with a reduced billable hour requirement that enabled her to spend more time with the children.

All three of the children have "medical conditions and/or learning disabilities." The middle child suffers from "debilitating" and "extreme sensory issues," the cause of which has been difficult to diagnose. This child was treated by a number of different behavioral health, traditional medical, and nontraditional medical providers between 2013 and 2016; the wife was responsible for scheduling and attending the vast majority of these appointments. In November 2013, the wife left the law firm and began working part-time from home so that she would have more time to attend to the children's needs.

In 2015, the husband accepted a full-time position as an interventional cardiologist in New Hampshire. Although the wife originally agreed to move to New Hampshire for two years, the eldest child was not accepted at the school desired by the parties in that State. As a result, the parties decided that the wife would remain in Newton with the children, and the husband would commute from Newton to New Hampshire. At some

point, the husband began residing with his parents in New Hampshire during the week and returning to Newton on the weekends. The marriage subsequently deteriorated, and the parties last lived together in November 2016. As the marriage declined, the parties' views diverged on medical treatment for their children, particularly for the middle child. The husband preferred traditional, evidence-based medical treatment, and the wife preferred nontraditional treatments such as alternative, homeopathic therapies.

2. <u>Divorce proceedings</u>. a. <u>Custody and parenting issues</u>. On November 28, 2016, the wife filed a complaint for divorce, requesting, among other things, primary physical custody and shared legal custody of the children, alimony, and child support. In January 2017, the parties executed a stipulation agreeing, among other things, to the appointment of a PC to resolve disputes regarding nonfinancial parenting issues, with the fees to be shared equally between the parties. With respect to custody and parenting time, the stipulation provided that the children would reside primarily with the wife, subject to the husband's parenting time every other weekend and two weekday dinner visits each week. The stipulation further provided that the parties would have shared legal custody, subject to certain

notice provisions regarding the children's medical care.[3]  This stipulation was incorporated into an order issued on February 28, 2017, which order required the husband to pay base unallocated support of $1,942 per week[4] and additional unallocated support equivalent to twenty percent of any bonus received by the husband in 2017.

On August 30, 2017, the husband filed an amended answer and counterclaim for divorce, seeking, inter alia, sole legal custody as to medical and school related decisions concerning the children (with shared legal custody for all other matters), and permission to remove the children to New Hampshire.

On September 27, 2017, the parties executed a stipulation agreeing to the appointment of a Guardian Ad Litem (GAL) to evaluate, investigate, and file a written report (including recommendations) on the issues of custody, the parenting plan, and the children's medical care.  On the same day, an order

---

[3] The parties acknowledged that all three children were on an "established non-traditional dietary and medicinal and nonmedicinal protocol" and agreed that they would provide each other with at least one week's notice of any scheduled medical appointments for the children.

[4] The base unallocated support represented thirty-five percent of the difference between the parties' incomes, after deducting their respective financial contributions to the children's au pair.

issued appointing Mira Levitt, Ph.D., as a "Guardian ad litem -
Evaluator" or "Category E GAL."[5]

On January 20, 2018, the parties agreed to the appointment
of Robin M. Deutsch, Ph.D., as PC to resolve any parenting
disputes for a period of two years, with the opportunity for the
parties to sign a new PC agreement after the two-year period
concluded; and that the PC's recommendations would be binding
"until the [c]ourt enters an order [or] [j]udgment altering,
modifying or rejecting her recommendation."  The parties further
agreed that once the PC's total fees exceeded $15,000 (based on
an hourly rate of $375), they would continue PC services only by
agreement.

On May 7, 2018, the GAL filed a seventy-four page report
wherein she recommended that the children continue to reside
primarily with the wife during the school year and spend three
weekends per month (and up to two dinner visits per week) with
the husband.  The GAL acknowledged that although the parties'
disagreements regarding the children's medical care might
warrant assigning one parent decision-making authority, such a
solution might not be in the children's best interests.  The GAL

---

[5] In addition to investigating and reporting factual data to
the court, a Category E GAL develops clinical opinions to assist
the judge (or adjudicator) in making custody and visitation
decisions.  See Care & Protection of Jamison, 467 Mass. 269, 288
n.30 (2014).

stated that while it would be impractical to grant the husband, rather than the wife, medical decision-making authority given that the wife is the children's primary caretaker, the wife's authority should not remain unchecked.[6]

b. Agreement for private adjudication. On March 6, 2019, the parties executed and filed with the court a stipulation providing, among other things, that they "agree to submit . . . an [o]rder of [r]eference for the [c]ourt's approval to submit the matter to private adjudication . . . for a trial on the merits." The stipulation was incorporated into a temporary order, stating that an "order of reference to [a]rbitrator/[m]aster shall be issued."

On March 7, 2019, before the parties submitted a draft order of reference as contemplated in their stipulation, the

---

[6] Specifically, the GAL recommended that (1) there be a clear structure by which medical decisions are made, with the parties settling on a team of agreed-upon medical providers for the children and, in the event that the parties cannot agree on a provider, the husband should make a final decision as to a provider in light of his medical training and knowledge of evidence-based treatments; and (2) the PC should continue to address parenting issues between the parties and, where the parties are unable to agree on a child's medical treatment, the PC should consult with the child's medical providers and defer to evidence-based treatments and standards of the American Academy of Pediatrics to make a provisional recommendation (which recommendation may be reviewed by a judge).

first judge assigned to the case[7] issued sua sponte an order of reference, providing, in relevant part, that:

> "all issues in the pending [c]omplaint for [d]ivorce [shall] be heard for final ruling through private adjudication on the merits with an agreed upon [a]rbitrator . . . . The [a]rbitrator will hear the parties, examine their evidence, make findings of fact, and set them forth in her adjudication. Said [a]rbitrator shall make a judgment supported by findings on each issue tried. The parties agreed to be bound by any finding, award or decision of arbitration, except to the extent that the award is modified by the court after review or to the extent that the controlling law may permit either party or both parties to seek judicial review of the arbitration award under applicable princip[les] of law. . . . The parties and [a]rbitrator/[m]aster are referred to Rule 53 of the Massachusetts Rules of Civil Procedure and Rules 20, 21 and 24 of the Probate Rules and Uniform Practice XXVIII which govern this procedure."

On May 28, 2019, the parties executed an "arbitration agreement" providing, inter alia, that the matter would be referred to the adjudicator "to hear the dispute as ARBITRATOR pursuant to Rule 53 of the Mass. Rules of Domestic Relations Procedure." See generally Mass. R. Dom. Rel. P. 53 (rule governing proceedings before masters).

A two-day hearing was held before the adjudicator on August 29 and 30, 2019. On December 20, 2019, the adjudicator circulated her first draft judgment, rationale, and findings of fact to the parties; these documents were not filed with the

---

[7] We understand that, based on the usual rotations in judicial scheduling, at least three judges have been assigned to these cases at different times.

Probate and Family Court.  Among other things, the December 2019 draft judgment proposed to grant the wife sole decision-making authority regarding the children's medical care, to which the husband submitted his objection; the wife opposed the husband's objection.  On February 7, 2020, the adjudicator filed with the Probate and Family Court an amended draft judgment and amended findings, proposing to reassign sole medical decision-making authority to the husband.  The wife filed an opposition to the amended draft judgment while the husband moved to adopt it. Following a hearing, a second judge issued an order recommitting the matter to the adjudicator and directing her to "make additional subsidiary findings as she deems appropriate and/or otherwise amend/modify the 'Draft Amended Judgments, Rationale and Findings of Fact' regarding the limited issues of legal custody regarding medical decision-making authority."[8]

In September 2020, after the adjudicator heard the recommitted matter, she issued to the parties further amended draft judgments and findings, which were not filed with the

---

[8] Although the December 2019 draft judgment was not separately filed with the court, the parties referred to the adjudicator's findings and judgment in their subsequent pleadings.  Considering those pleadings, the judge stated that the adjudicator's December 2019 findings appeared to support the grant of medical decision-making authority to the wife and noted that the adjudicator's February 2020 amended findings reflected changes to only eight of 458 findings, none of which pertained to medical decision-making.

Probate and Family Court (September 2020 drafts).  The September 2020 drafts reaffirmed the February 2020 drafts, proposed providing the husband with final medical decision-making authority, and addressed several other matters that were outside the scope of the recommitment order.  The wife objected to certain aspects of the September 2020 amended drafts.

On December 2, 2020, the adjudicator issued an order concluding that the recommitment order limited her review to the issue of medical decision-making authority only, and that the only changes between the February 2020 and December 2020 drafts would relate to medical decision-making authority, as other changes contained in the September 2020 drafts exceeded the scope of the recommitment order.[9]

c.  <u>Adjudicator's December 2020 drafts</u>.  The adjudicator filed the second amended draft judgments, findings, and rationale with the Probate and Family Court (December 2020 drafts).  The draft proposed to award the wife physical custody, establish a parenting plan for the husband, continue the appointment of the PC for three years, and grant shared legal custody of the children subject to the husband's final medical

---

[9] The adjudicator also made some additional changes that she characterized as the correction of scrivener's errors, none of which bear on the issues in this appeal.

decision-making authority.  As to the latter, the December 2020 draft judgment provided that:

> "The parties shall initially address the medical treatment options with the Parenting Coordinator. . . .  In the case of an inability of the parties to agree to medical treatment, the [husband] shall have the final decision making authority. . . .  [The] [w]ife may only schedule medical appointments for the children only after advance notice to the [h]usband.  Failure to provide advance notice shall be cause to readdress who shall make medical appointments.  If the parties cannot agree, the [h]usband shall make the decision on the particular appointment. Neither party is to impose any dietary restrictions on the children without the expressed consent of the other party. Neither party is to administer any prescribed or over the counter medications without the expressed consent of the other party.  The children are to be administered any and all prescribed or over the counter medications to which both parties have agreed acknowledged in a written email."

Fifteen new findings pertaining to medical decision-making were included in the adjudicator's December 2020 draft findings.

With respect to support and child-related expenses, the December 2020 draft judgment provided, in relevant part, that (1) the husband shall pay base unallocated support of $1,986.38 per week, until the first to occur of either party's death, the wife's remarriage or cohabitation (as defined in G. L. c. 208, § 49), or 160 months from the date of divorce; and (2) the husband shall pay additional unallocated support equivalent to twenty percent of the husband's gross bonus income.  With respect to the property division, the December 2020 draft judgments allocated the parties' assets so as to effectuate an equitable and nearly equal distribution.

On December 21, 2020, the husband filed in the Probate and Family Court a motion requesting several modifications to the December 2020 draft judgments and findings concerning the parenting plan, unallocated support, and property division.  On December 23, 2020, the wife filed a motion requesting that the December 2020 draft judgments and findings be adopted as-is, except that she requested final medical decision-making authority be granted to her instead of the husband.

d.  Ruling on the adjudicator's submissions.  On April 27, 2021, the judge entered an order on the parties' motions, largely accepting and adopting the December 2020 draft judgments and findings (April 2021 order).  Relying on Gravlin, 89 Mass. App. Ct. at 367-368, the judge concluded that the parties "agreed to binding arbitration," thus he was "strictly bound" by the adjudicator's findings and conclusions of law "even if they are in error," and further, that he was required to give "extreme deference" to the adjudicator's findings, rationale, and judgment in the exercise of his "nondelegable duty to review and assess the same."  The judge concluded that "there is no evidence, or even an allegation, that the [adjudicator]:  (1) exceeded her authority by granting relief beyond that to which the parties bound themselves or awarded relief prohibited by law; and/or (2) decided the matter based on 'fraud, arbitrary conduct, or procedural irregularity in the hearings.'"

With respect to medical decisions, the judge found that the findings and rationale of the adjudicator were clear and supported her decision. He acknowledged that there were sufficient findings to justify an order giving the wife final decision-making authority, but that the adjudicator's decision giving that authority to the husband was supported by the record. He adopted the adjudicator's decision regarding medical decision-making, with one modification allowing for the parties to unilaterally administer over-the-counter medication to the children in the event of an "emergency."

The judge accepted and adopted the December 2020 draft findings and rationale in full and issued a divorce judgment adopting the December 2020 draft judgment in its entirety (except for the change related to over-the-counter medication, and a correction of a clerical error not pertinent here). The present cross appeals followed.

Discussion. 1. Standards of review. a. Standard applicable to judge's review. As an initial matter, we agree with the parties that the judge, in reviewing the adjudicator's December 2020 drafts, improperly applied the Gravlin standard (which adopted the standard applicable to binding arbitrations under the Uniform Arbitration Act for Commercial Disputes, G. L. c. 251 [UAACD]), rather than the standard applicable to proceedings involving masters under Mass. R. Dom. Rel. P. 53.

There is a significant difference between the standards.  A judge reviewing a binding arbitration award "is confined to determining whether the arbitrator (1) exceed[ed] h[er] authority by granting relief beyond the scope of the arbitration agreement, . . . by awarding relief beyond that to which the parties bound themselves, . . . or by awarding relief prohibited by law, or (2) decided the matter based on fraud, arbitrary conduct, or procedural irregularity in the hearings" (quotations omitted).  Gravlin, 89 Mass. App. Ct. at 367-368.  The judge typically does not review the arbitrator's findings and conclusions of law for clear error.  Id. at 368.  "This strict standard of review is highly deferential to the decision of an arbitrator" (emphasis added).  Id., quoting School Comm. of Lexington v. Zagaeski, 469 Mass. 104, 110 (2014).

By contrast, "there is no requirement that a master's recommendations be given total deference."  Ross v. Ross, 385 Mass. 30, 38 (1982).  "The main object of referring a suit to a master is to have the facts settled by [her] . . . .  [I]t remains for the trial judge to enter the proper judgment on the facts as found and on the law as applied thereto" (quotation and citation omitted).  Hardiman v. Hardiman, 11 Mass. App. Ct. 626, 628 (1981).  "The master's conclusions of law do not determine the legal effect of the facts found by h[er] and, a fortiori, do not determine the choice of remedy where such choice lies within

the discretion of the trial judge." Id. Thus only "[t]he master's findings of fact are binding on the probate judge and on this court," Osborne v. Osborne, 384 Mass. 591, 601 (1981), quoting Chase v. Pevear, 383 Mass. 350, 359 (1981) -- unless they are "clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law." Mass. R. Dom. Rel. 53 (h) (1). "With respect to the master's ultimate conclusions, . . . '[w]e must apply our own view of the law, and we must consider whether the master's general findings, on a correct view of the law, are consistent with his subsidiary findings.'" Osborne, supra, quoting Chase, supra at 359-360.

Here, the parties stipulated that they would submit the matter for "private adjudication" and would file a draft order of reference to the court. Before they could do so, a judge issued a sua sponte order referring the matter to "arbitration." Although the judge's order of reference submitted the matter to "arbitration," it is the content of the parties' stipulation and subsequent agreement that controls. See Gravlin, 89 Mass. App. Ct. at 365-366 ("A judge may not . . . order parties to submit to binding arbitration absent their agreement, as such an order would be an improper delegation of the judge's authority under G. L. c. 208, § 34").

The parties here, unlike the parties in <u>Gravlin</u>, did not, through their subsequent agreement regarding the proceedings to be held before the adjudicator, submit the matter to "binding arbitration." <u>Gravlin</u>, <u>supra</u> at 366. There is no reference to "binding arbitration" in their stipulation or subsequent agreement, and they did not reference the rules applicable to binding arbitrations under <u>Gravlin</u> or the UAACD. Rather, the parties' agreement provided, in relevant part, that the adjudicator would "hear the dispute as ARBITRATOR <u>pursuant to Rule 53 of the Mass. Rules of Domestic Relations Procedure</u>" (emphasis added). The agreement further provided that:

> "[t]he parties agree to be bound by any finding, award or decision of arbitration, <u>except to the extent that the award is modified by the court after review</u> . . . . The parties and Arbitrator/Master are referred to <u>Rule 53 of the Massachusetts Rules of Civil Procedure and Rules 20, 21 and 24 of the Probate Rules and Uniform Practice XXVIII</u> which <u>govern this procedure</u>. . . . [T]he Arbitrator will issue an arbitration decision in writing and deliver a copy of the decision to each party . . . . The <u>decision shall be binding upon both parties</u>, <u>subject only to</u> the applicable rules and law in the Commonwealth of Massachusetts for arbitrations (specifically, <u>Rule 53 of the Mass. Rules of Domestic Relations Procedure</u>)" (emphasis added).

Thus, notwithstanding the parties' use of the terms "arbitrator" and "arbitration" in the agreement, they intended for the procedure to be governed by rule 53, which applies only to proceedings involving masters. See Mass. R. Dom. Rel. P. 53 (a) (i) ("'master' shall mean any person, <u>however designated</u>,

who is appointed by the court to hear evidence in connection with any action and report facts" [emphasis added]). Although the parties stated that they would be "bound by any finding, award or decision" made by the adjudicator, they also expressly stated that the award could be "modified" by a judge "after review" pursuant to rule 53. In the absence of clear, unequivocal language stating that the parties intended to submit the case to "binding arbitration," we cannot conclude that the parties intended to be so bound.

Moreover, the parties' intent to proceed under Rule 53 can be further gleaned from their conduct after executing the agreement, as they followed the procedures set forth under rule 53 throughout the proceedings before the adjudicator and judge.[10] See Springfield v. Department of Telecomm. & Cable, 457 Mass. 562, 572 (2010), quoting Restatement (Second) of Contracts, § 202 (4) (1981) ("any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement"); Lodge Corp. v. Assurance Co. of Am., 56 Mass. App. Ct. 195, 197 n.4 (2002), quoting Restatement (Second) of Contracts § 202 (5) (1981) ("Wherever reasonable, the manifestations of intention of the parties to a

---

[10] On numerous occasions, the parties followed the Rule 53 procedures for suggesting amendments to the draft report, see Mass. R. Dom. Rel. P. 53 (g) (2); and objecting to the report, see Mass. R. Dom. Rel. P. 53 (h) (1)-(2).

promise or agreement are interpreted as consistent with each other and with any relevant course of performance [or] course of dealing").

In reviewing a master's report,

"the court shall accept the master's subsidiary findings of fact unless they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law. . . . The court may draw its own inferences from the master's subsidiary findings. The court may make findings in accordance with [Mass. R. Dom. Rel. P.] 52, which are in addition to the master's findings and not inconsistent therewith, based either on evidence presented to the court or evidence before the master which was recorded by means approved by the master before commencement of the hearing."

Mass. R. Dom. Rel. P. 53 (h) (1).

Accordingly, to the extent that the judge gave substantial deference to the adjudicator's rulings, rather than employing the less deferential review prescribed by Rule 53, this was error. See Gustin v. Gustin, 420 Mass. 854, 857-858 (1995) ("Absent an agreement of the parties, by stipulation or otherwise, the role of the intermediary . . . should be limited to hearing the matter and making a recommendation to the Probate Court judge. The judge . . . must promulgate the final, and binding, disposition of the [case] consistent with the terms of [the applicable] statute. The judge cannot delegate this duty."); Hardiman, 11 Mass. App. Ct. at 628 ("To give the master's disposition any weight beyond that of a recommendation would be an abdication of the judicial function"). See also

Robbins v. Robbins, 16 Mass. App. Ct. 576, 577 n.2 (1983) ("The master's 'ultimate findings' . . . are recommendations which are not binding on the judge").

b. Appellate standard of review. Under rule 53, we review a master's findings for clear error, while reviewing conclusions of law de novo. See Pollock v. Marshall, 391 Mass. 543, 554-555 (1984). Where, however, the judge did not treat the adjudicator's ultimate rulings as mere recommendations but instead gave them "extreme deference," the judge improperly delegated his duty to exercise his discretion in making a final determination of the issues. See Bower v. Bournay-Bower, 469 Mass. 690, 707 (2014); Gravlin, 89 Mass. App. Ct. at 365-366. In such circumstances, the improperly delegated issues must be remanded to the judge for final determination by him. With these principles in mind, we turn to the parties' individual contentions.[11]

---

[11] We briefly address the husband's related contention that the adjudicator, and by extension the judge, improperly interpreted the recommitment order (which was issued by a different judge) as being limited solely to the medical decision issue. He claims that, as a result, the adjudicator failed to correct errors in her findings and rulings pertaining to the parenting plan, property division, and support, which errors were then adopted by the judge. We do not discern any error in the adjudicator's deference to the express language of the recommitment order, which limited the scope of the recommitment to the issue of medical decision-making. Because this was a master proceeding under Rule 53, the judge who issued the recommitment order had the discretion to limit the scope of the recommitment. See Mass. R. Dom. Rel. P. 53 (h) (4) ("The court

2. Legal custody as to medical decisions. a. Clearly erroneous findings. The wife asserts that the majority of the findings underpinning the adjudicator's decision to grant the husband medical decision-making authority were clearly erroneous. "[W]e accept the . . . findings of fact as true unless they are clearly erroneous. A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotations and citations omitted). Kendall v. Selvaggio, 413 Mass. 619, 620-621 (1992).

With the limited exceptions we discuss here, we discern no error in the findings challenged by the wife. We agree that the finding that the wife failed to timely notify the husband of the eldest child's broken arm is clearly erroneous.[12] We further agree that the findings which state that the wife addressed a package to the children referring to them by her surname instead

_____

may adopt the report, strike it in whole or in part, modify it, recommit it to the master with instructions or take any other action that justice requires" [emphasis added]). The adjudicator appropriately adhered to the instructions set forth in the recommitment order.

[12] The remainder of that particular finding, that the wife has sometimes failed to notify the husband of doctor's appointments, is not clearly erroneous.

of their own,[13] are clearly erroneous and inconsistent with other findings that the husband overstated the incident to make it appear that the wife was seeking to exclude him from the children's lives.  We need not, however, address the impact, if any, of these erroneous findings because the trial judge must first make a determination as to the children's best interests based on all of the non-erroneous subsidiary findings made by the adjudicator -- which the trial judge did not do here.

b.  Standard applied to medical decisions issue.  The wife contends that the judge erroneously applied the highly deferential Gravlin standard when reviewing the adjudicator's ruling on the medical decision-making issue.  The husband, however, contends that the judge's evaluation of the adjudicator's subsidiary findings regarding medical decisions reflected a less deferential review that is more consistent with what Rule 53 prescribes.  For the reasons that follow, we agree with the wife and disagree with the husband.

Here, the judge reviewed the adjudicator's subsidiary findings not for clear error, but for the limited purpose of ascertaining whether there was any support for the adjudicator's medical decision ruling in her findings.

---

[13] The children used the husband's surname.

Similarly, the judge did not draw his own legal conclusions regarding the subsidiary findings -- apart from stating there were findings that would support the grant of medical decision-making authority to <u>either</u> parent -- and the judge did not make his own discretionary determination regarding the best interests of the children. See G. L. c. 208, §§ 28, 31; <u>Kendall</u> v. <u>Kendall</u>, 426 Mass. 238, 251 (1997), cert. denied, 524 U.S. 953 (1998) ("The determination of custody rests within the discretion of the judge"); <u>Rolde</u> v. <u>Rolde</u>, 12 Mass. App. Ct. 398, 402 (1981) ("in deciding issues involving custody, the overriding concern of the [judge] must be the promotion of the best interests of the children and their general welfare").

Because the judge did not treat the adjudicator's ruling as a mere recommendation, and instead gave it unwarranted deference, he improperly delegated his authority under G. L. c. 208, § 28 and § 31. See <u>Bower</u>, 469 Mass. at 707. Accordingly, the issue of medical decision-making must be remanded to the judge for the purpose of reviewing the adjudicator's findings and recommended rulings pursuant to rule 53, and for the judge to make the final discretionary determination concerning which parent will promote the children's best interests.[14]

---

[14] Of course, on remand the judge is free to consider whether it would be in the children's best interests for the

We take this opportunity to comment on an issue that is likely to arise on remand.  We note that it is generally inappropriate to grant shared legal custody to parents who display a high level of acrimony that impedes their ability to jointly make decisions about the children's welfare.  See Carr v. Carr, 44 Mass. App. Ct. 924, 925 (1998), cert. denied, 525 U.S. 1073 (1999).  Notwithstanding that fact, where one parent has primary physical custody of the children, we have concerns about the practicality of granting partial sole legal custody regarding medical decisions to the other parent -- particularly where the children are in the custodial parent's care eighty percent of the time, the children have extensive medical issues, and the custodial parent is responsible for taking the children to ninety percent of their medical appointments.  Although there is no statutory prohibition against granting sole legal custody (partial or full) to a parent who does not have physical custody, see G. L. c. 208, §§ 28, 31, we conclude that, based on the particular circumstances presented here, the judge should make specific subsidiary findings clearly demonstrating that, if the judge grants partial sole legal custody regarding medical decisions to the parent who does not have physical custody, the decision is necessary to promote the children's safety and

parents to retain some form of joint authority for medical decisions.

wellbeing.  See G. L. c. 208, § 31.  Accordingly, the judge to whom the case is assigned on remand may make such additional findings if the judge determines, in his or her sole discretion, that they are warranted by the evidence.  See Mass. R. Dom. Rel. P. 53 (h) (1).

3.  Parenting plan.  The husband complains that the judge, in applying the Gravlin standard, failed to properly consider certain requested corrections to aspects of the adjudicator's parenting plan that he asserts were contrary to the GAL's recommendations.  The husband's proposed changes included increasing his parenting time to three weekends per month.

While a judge is not required to adopt a GAL's recommendation, see Pizzino v. Miller, 67 Mass. App. Ct. 865, 876 (2006), where the judge rejects that recommendation, the judge should explain his or her reason for doing so.  See Ventrice v. Ventrice, 87 Mass. App. Ct. 190, 196 (2015).  Here, however, the judge did not explain the basis for departing from the GAL's recommendation because he did not exercise his discretion to determine an appropriate parenting plan.  Rather, he incorrectly applied the highly deferential Gravlin standard and deferred to the adjudicator's determination.[15]  This was an

---

[15] With respect to the parenting plan, the judge stated that:

improper delegation of his judicial authority.  Bower, 469 Mass. at 707.  Accordingly, so much of the divorce judgment as pertains to the parenting plan must be vacated and remanded for the judge to consider the adjudicator's findings and recommendations and exercise his or her discretion to determine an appropriate parenting plan in the children's best interests.

4.  Parenting coordinator.  The husband contends that the judge erroneously adopted the adjudicator's ruling extending the appointment of the PC to resolve parenting disputes.  The husband further contends that, in the absence of an agreement between the parties to pay for the PC to mediate medical disagreements going forward, it was improper to require the parties to submit medical disputes to the PC in the first instance before the husband could exercise final medical decision-making authority.  We agree with both contentions.

While judges "possess the inherent authority to appoint parent coordinators in appropriate circumstances . . . the appointment in this case exceeded the bounds of that authority."

---

"[The] [h]usband raises several parenting issues (primarily logistical) that he does not like in the draft Amended Judgment that he would like modified.  Based upon the [Gravlin] standard . . . they do not demonstrate that the [a]rbitrator exceeded her authority or decide the matter based upon 'fraud, arbitrary conduct, or procedural irregularity in the hearings.'  The issues raised are all matters that can be presented to the Parent Coordinator . . . .  [T]he [a]rbitrator's ruling shall stand."

Bower, 469 Mass. at 698.  First, absent the express agreement of the parties, "a judge cannot shift the final decision-making authority granted by statute to a third party."  Id. at 707. Second, "a judge may not require the parties to use the services of the parent coordinator if the order would require one or both parents to pay for the services without his or her consent." Id.  Here, the parties' January 2018 agreement to use the PC was specific and detailed.  Importantly, the parties only agreed to the PC's appointment through January 2020.  The divorce judgment, however, extended the appointment by an additional three years, through March 2024, thereby improperly requiring the parties to pay the PC's fees for an additional three-year period without the fee cap agreed upon by the parties.  See id. This was error.

Accordingly, so much of the divorce judgment as requires the parties to continue using, and paying for, the PC must be vacated.

5.  Property division.  The husband contends that the judge erred when concluding that the adjudicator properly determined the date for valuing the marital estate for purposes of equitable division under G. L. c. 208, § 34.  We disagree.

Here, the adjudicator valued the property contained in the marital estate at the time of the divorce rather than at the time of the parties' separation.  She made detailed findings

regarding property acquired by the parties after their separation. She found that the home in which the wife resided had negative equity at the time of the hearing. The adjudicator also found that the down payment for the husband's home was made with marital funds and thus constituted a marital asset subject to equitable distribution; however, the net equity in the property (acquired by the husband in part through his mortgage payments) was not includable in the marital estate. Additionally, the adjudicator found that the husband purchased a motorcycle during the pendency of the divorce proceedings, in violation of the automatic restraining order, and therefore the adjudicator treated the net equity as includable in the marital estate. The adjudicator treated the husband's other individual assets as marital property subject to equitable distribution. Similarly, with the exception of two Swedish bank accounts established by the wife's grandparents decades before the parties were married, the adjudicator treated all of the wife's individual assets as includable in the marital estate for purposes of equitable distribution under G. L. c. 208, § 34.

The husband asserts that it was error to treat property acquired postseparation as includable in the marital estate and that the appropriate date for identifying marital assets was the

date of the parties' separation.[16]  The husband raised this issue

with the judge, who phrased the issue before him as "whether

applying the [a]rbitrator's [f]indings and [j]udgment result[ed]

in an inequitable division of assets that is contrary to [G. L.

c. 208, § 34]."  The judge ruled that:

> "Assets are typically valued and divided as of the date of
> divorce. . . .  Treating the [husband's] assets [acquired
> postseparation] as marital assets subject to division
> hardly results in an inequitable division of assets or
> otherwise violate[s] public policy or dictate[s] a result
> in violation of [G. L. c. 208, § 34].  Even assuming that
> the funds as set forth by [the] [h]usband were all
> accumulated post separation and after paying support to
> [the] [w]ife, [the] [h]usband was able to [] accumulate
> those assets because [the] [w]ife was primarily responsible
> for the care of the parties' children . . . .  While [the]
> [h]usband was able to work full time, [the] [w]ife was
> unable to do so.  She did not have the luxury of working
> full time to accrue additional savings and assets.
>
> . . . .

---

[16] The husband claims that the parties "separated their bank accounts in early 2017," citing to the parties' January 2017 stipulation (which makes no mention of dividing the parties' bank accounts) and the adjudicator's finding that the parties "split up their joint accounts" when the wife filed for divorce. This does not, however, demonstrate that the parties agreed to a particular division of their accounts, thereby foreclosing any division of those accounts in the divorce judgment.  The husband further contends that it was error to divide as a marital asset his bank account from which he pays unallocated support to the wife, in essence arguing that such division constitutes inequitable double-dipping.  We note that double-dipping is not prohibited as a matter of law.  See Fehrm-Cappuccino v. Cappuccino, 90 Mass. App. Ct. 525, 527 n.4 (2016).  Moreover, the husband was ordered to pay unallocated support based on his ongoing stream of earned income, rather than by liquidating a particular asset.  Accordingly, it is possible to identify separate bases for the property division and unallocated support award.  Id. at 528 n.5.

The Court is satisfied that including the assets acquired after separation as part of the marital division of assets is both fair and equitable and well within the statutory demands of [G. L. c. 208, § 34]. . . . '[T]he care and maintenance of a child by a spouse even while separated is a contribution to the marital partnership.' Wheeler v. Wheeler, 41 Mass. App. Ct. 743, 745 (1996)."

Although the judge purported to conduct a limited review under Gravlin, it is apparent that he drew his own legal conclusion when determining the timing of the valuation of the parties' assets. He did so based on the fact that the wife's contributions to the marital enterprise continued throughout the parties' separation. Compare Wheeler, 41 Mass. App. Ct. at 745, with Savides v. Savides, 400 Mass. 250, 252-253 (1987). Because the judge weighed the adjudicator's findings and independently made a conclusion of law regarding the appropriate date for dividing the marital estate, we discern no error.[17]

6. Unallocated support. We are unpersuaded by the husband's various challenges to the judgment's unallocated support provision. With respect to the husband's 2019 income, the adjudicator made findings based on the evidence at the hearing before her, which concluded in August 2019. The

---

[17] The husband does not challenge as clearly erroneous any subsidiary findings pertaining to the property division, nor does he challenge other aspects of the property division. Accordingly, because our review of the property division is confined to the date of valuation issue only, we leave all other aspects of the divorce judgment pertaining to property division undisturbed.

evidence included the husband's January 2019 employment contract. The adjudicator determined that the husband's projected 2019 income, including salary, bonuses, and fringe benefits would be $764,447.76.[18] The husband claims that this figure far exceeds the income reported on his 2019 W-2 form; however, his W-2 form was not in evidence at the hearing before the adjudicator. Notwithstanding, to the extent that there is any error in the calculation of the husband's 2019 income as compared to his 2019 W-2 form, the error is harmless because it is confined to the calculation of his projected 2019 bonus income, not his salary. The husband's unallocated support obligation is based on his salary only.[19] The husband is also required to pay additional unallocated support equivalent to twenty percent of his gross bonus income from the prior year. His additional unallocated support obligation is not predicated on any calculation (erroneous or otherwise) of projected bonus

---

[18] The adjudicator found that as of August 22, 2019, the husband's income totaled $405,971.87. She found that the husband's August 29, 2019, financial statement that reported gross weekly income of $6,634 was not credible as to his bonus and total gross income.

[19] The base support amount of $1,986.38 per week is the equivalent of thirty-five percent of the difference between the husband's weekly salary of $6,634.62 ($345,000 per year) and the wife's weekly income of $959.24. See G. L. c. 208, § 53 (b).

income, rather, it is based on his actual bonus income already received.

With respect to the wife's receipt of financial contributions from her parents, the husband contends that the adjudicator, and by extension the judge, erroneously disregarded them when determining the wife's need for support. The husband did not, however, raise this issue in his motion setting forth his objections to the adjudicator's December 2020 draft judgment and findings. Therefore it is not properly before us on appeal. "An issue not raised or argued below may not be argued for the first time on appeal" (citation omitted), Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006); accordingly, it is waived.[20]

---

[20] Even if the issue had been properly raised below, we discern no error in the determination of the wife's need for support based on the record before us. The adjudicator found that, in light of the shortfall between her income and credible expenses, the wife was in need of support. See G. L. c. 208, § 53 (b). The adjudicator also found that child support was warranted, thereby leaving intact the unallocated support order originally put in place by a judge. The adjudicator found that the wife has interests in a number of revocable and irrevocable trusts settled by her father, but there is no indication that that the wife presently receives trust distributions. The wife's trust interests were properly treated as expectancies in connection with her opportunity for the future acquisition of assets and income pursuant to G. L. c. 208, § 34. The adjudicator also made findings about the wife's parents' annual gifting and expectation that the practice would continue postdivorce, as well as their payment of certain child related expenses, but declined to reduce the husband's support obligation on that basis because "the [w]ife's parents have no legal obligation to support the [w]ife and children. Any

Finally, the husband contends that it was error to award unallocated support for a period of 160 months, without considering "the years of temporary support payments as a result of the extenuated litigation." However, the husband did not raise this argument in his motion filed in the Probate and Family Court setting forth his objections to the adjudicator's December 2020 draft judgment and findings. Accordingly, the issue is not properly before us on appeal and is waived. See Carey, 446 Mass. at 285. We nevertheless note that the duration of general term alimony generally commences at the entry of the divorce judgment, and a judge is not required to consider the duration of temporary alimony, especially where there is no indication that the recipient spouse was to blame for the protracted nature of the divorce proceedings. See Holmes v. Holmes, 467 Mass. 653, 659-661 (2014).

Conclusion. So much of the divorce judgment as pertains to legal custody regarding the children's medical treatment, the parenting coordinator, and the parenting plan is vacated and

---

assistance she receives from them is voluntary on their part." To the extent that the unallocated support order contains a child support component, see Duval v. Duval, 101 Mass. App. Ct. 752, 761 (2022) (unallocated support typically treated as hybrid family support order with both child support and alimony components), we discern no error in the adjudicator's consideration of the fact that the wife's parents have no legal obligation to support the children. See Murray v. Super, 87 Mass. App. Ct. 146, 155 (2015).

remanded to the Probate and Family Court for further proceedings consistent with this opinion.  The divorce judgment is affirmed in all other respects.[21]

So ordered.

---

[21] The wife's request for attorney's fees and costs is denied.